UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| ROCKET SOFTWARE, INC., *a Delaware corporation*, and ROCKET SOFTWARE B.V., *a Netherlands private limited company*, | Case No. 3:22-cv-00327-AR |
| Plaintiffs/Counter Defendants, | **FINDINGS AND RECOMMENDATION** |
| v. | |
| COLLEGENET, INC., *a Delaware corporation*, | |
| Defendant/Counter Claimant. | |

_____

**ARMISTEAD, Magistrate Judge**

Plaintiffs Rocket Software, Inc. and Rocket Software B.V. (collectively, Rocket) bring this action against CollegeNET, Inc. seeking unpaid royalty fees for CollegeNET's sublicensing of Rocket's software products. Rocket asserts claims for breach of contract and copyright infringement under 17 U.S.C. § 106 *et seq*. Before the court is Rocket's motion to dismiss

Page 1  – FINDINGS AND RECOMMENDATION

CollegeNET's counterclaim for violation of California's Unfair Competition Law (UCL), CAL. BUS. & PROF. CODE § 17200, and CollegeNET's motion to strike information raised in Rocket's reply, or its motion to file a surreply. As explained below, Rocket's motion to dismiss should be DENIED and CollegeNET's motion to strike should be GRANTED.

## BACKGROUND

Rocket's predecessor, Uniface Corporation B.V. and Uniface Corporation (collectively, Uniface) was a worldwide software company that developed and supported software providing a secure platform for application development that could be integrated across different runtime environments, such as web, cloud, and mobile offerings. In 2021, Rocket acquired Uniface and its assets and became the owner of all Uniface software products and copyrights. Rocket also became the assignee and successor-in-interest to agreements with customers involving Uniface software products. Rocket and Uniface do not sell or transfer ownership of Uniface software products; instead, Uniface customers purchase licenses to use the software, or they sell sublicenses of Uniface software. (Compl. ¶¶ 7-11, ECF No. 1.)

CollegeNET is a Portland, Oregon-based company that provides web-based, on-demand technologies to colleges, universities, and non-profit organizations through its Software as a Service (SaaS). CollegeNET's technologies include academic scheduling and event management; space use analysis and planning; video interviewing for admissions, hiring, and career services; international student services; and complete online admissions services, from recruitment through matriculation. (Answer & Countercl. ¶¶ 1-3, ECF No. 17.) In 1994, Uniface and CollegeNET entered into a Standard Value-Added Reseller Agreement (Agreement) allowing CollegeNET to sublicense Uniface software as incorporated into

CollegeNET's applications in exchange for royalty payments. The Agreement set terms for how the royalties were calculated, including payments "for each copy of the Runtime Software as incorporated in the [CollegeNET] Application Software licensed by [CollegeNET] and delivered to an end user," and an annual support fee for each maintained end user. The Agreement set the royalty rates to "be calculated as a percentage of VAR's application list price for the VAR Application Software and upgrades thereto." Uniface and CollegeNET amended and extended their licensing agreement through December 31, 2020. (Compl. ¶¶ 16-19.)

A 2018 amendment to their Agreement altered the royalty and maintenance fee calculations. For the term from January 1, 2018 to December 31, 2020, the parties agreed that the applicable royalty rates would be

> *Royalty/Maintenance Rate for Application Purchased by End User:*
>
> Royalty Fee                 9% of VAR Application Sale Price
>
> Annual Maintenance          2% of VAR Applicable Sale Price

The Agreement required CollegeNET to submit quarterly reports that included information showing the number of licenses CollegeNET sold to end users incorporating Uniface software, the sale price of the application, and total amount of royalties due to Uniface. The Agreement also provided that California law governed its terms and that Uniface had the right to hire an independent auditor examine to CollegeNET's books and records of sales. (Compl. ¶¶ 20-25.)

In 2021, Rocket[1] exercised its audit rights and retained third-party KPMG to examine CollegeNET's accountings of Rocket's software that it sublicensed. KPMG's audit concluded

---

[1]    Because Rocket purchased Uniface in 2021 and acquired all of Uniface's assets and liabilities at that time, the court refers to Uniface as "Rocket" for the remainder of this Finding and Recommendation.

that CollegeNET underpaid royalties from January 2017 through December 2019. CollegeNET has refused to pay Rocket's requested additional royalties. (Compl. ¶¶ 26-30.)

On March 1, 2022, Rocket filed this action alleging breach of contract and copyright infringement seeking to recover the alleged underpayment of royalties and damages for CollegeNET's unauthorized copies, installations, and distributions of Rocket's software without properly paying for its license.

On May 5, 2022, CollegeNET filed an Answer and Counterclaims for breach of the implied covenant of good faith and fair dealing and violation of California's UCL, CAL. BUS. & PROF. CODE § 17000 *et seq*. In its counterclaims, CollegeNET asserts that its Agreement with Rocket provided that it would pay Rocket a percentage of the initial fees it charged each customer and a percentage of the continuing service fees it charged those customers. CollegeNET contends that later amendments to the Agreement changed the percentages it paid Rocket, but that the 2018 amendments did not alter the way CollegeNET calculated and reported those percentages to Rocket. (Answer & Countercl. ¶¶ 12-24.) CollegeNET asserts that for 26 years, it submitted quarterly royalty reports to Rocket without incident. (Answer & Countercl. ¶¶ 26-33.) In CollegeNET's view, five months before the Agreement was set to expire, in July 2020, Rocket invoked its right to audit in bad faith by providing KPMG with false information about the parties' course of dealings, unreasonable assumptions about the Agreement, and with the intent to demand additional payments from CollegeNET. CollegeNET asserts that it has discovered that Rocket has engaged in similar conduct with other Rocket customers and that Rocket knew that it provided KPMG with false and unreasonable assumptions and directed KMPG to conduct the sham audits. CollegeNET alleges that it expended considerable time,

effort, resources, and expenses complying with Rocket's sham audit, resulting in damages. (Answer & Countercl. ¶¶ 35-61.)

On June 15, 2022, Rocket filed this motion to dismiss CollegeNET's counterclaim for violation of the UCL. (Pls.' Mot. Dismiss, ECF No. 30.) CollegeNET timely filed a response and Rocket filed a reply, supported by the Declaration of Theresa H. Wang. Subsequently, CollegeNET moved to strike arguments in Rocket's reply that it considered new and to exclude an exhibit attached to Wang's declaration. Alternatively, CollegeNET seeks to have the court consider the briefing it submitted as a surreply.

On September 22, 2023, the court asked the parties for additional briefing on the issues of whether the court has subject matter jurisdiction as interpreted by the Ninth Circuit in *Scholastic Ent., Inc. v. Fox Ent. Grp., Inc.*, 336 F.3d 982 (9th Cir. 2003), and whether CollegeNET has sufficiently alleged UCL standing. The court held oral argument on those issues on October 26, 2023. (Order for Briefing, ECF No. 68; Minutes of Proceedings, ECF No. 76.) Based on the briefing and arguments the parties presented, the court concludes that it has subject matter jurisdiction. Rocket Software seeks statutory damages under Section 504(c)(2) of the Copyright Act, which satisfies the first prong of the *T.B. Harms* test adopted by the Ninth Circuit in *Scholastic*. The court addresses the remaining arguments raised by the parties in their motions and supplemental briefing below.[2]

\ \ \ \ \

\ \ \ \ \

---

[2]    The court concludes that additional oral argument would not be helpful. LOCAL RULE 7-1(d).

Page 5 – FINDINGS AND RECOMMENDATION

## LEGAL STANDARDS

To survive a motion to dismiss, a complaint or counterclaim "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). "A claim has facial plausibility when the plaintiff [or counterclaim-plaintiff] pleads factual content that allows the court to draw the reasonable inference that the [other party] is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a [party] has acted unlawfully." *Mashiri v. Epstein Grinnell & Howell*, 845 F.3d 984, 988 (9th Cir. 2017) (internal quotation marks omitted) (citing *Iqbal*, 556 U.S. at 678). "These principles apply with equal force to claims in a complaint and counterclaims in a responsive pleading." *Lake v. Esposito*, 3:21-cv-601-SI, 2022 WL 205622, at *1 (D. Or. Jan. 24, 2022) (citing *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011)).

## DISCUSSION

### A.    *Motion to Dismiss UCL CounterClaim*

Rocket's view that its audit was lawfully invoked under the Agreement forms the basis for its arguments that CollegeNET's UCL counterclaim must be dismissed. That is, (1) because Rocket was exercising its right to audit, CollegeNet lacks standing under the UCL because it cannot show any injury; (2) because auditing royalty payments under the Agreement means that its audit was not unlawful, unfair, or fraudulent, CollegeNet has failed to plead sufficient facts on the three UCL prongs needed to state a claim; and (3) because the audit has been completed and the UCL provides only the remedies of injunction or restitution, CollegeNet has failed to plead a

cognizable remedy under the UCL. CollegeNET responds that it diverted resources to respond to Rocket's sham audit, an adequate injury, and that its request for an injunction against future audits is a sufficient remedy. CollegeNET also argues that its counterclaim for breach of the implied covenant of good faith and fair dealing may serve as a predicate for its UCL unlawful prong claim and that it has sufficiently pleaded UCL claims under the unfair and fraudulent prongs.

### 1.     UCL Claim standing

The UCL prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising[.]" CAL. BUS. & PROF. CODE § 17200. "[A] person who has suffered injury in fact and has lost money or property as a result of the unfair competition" has standing to assert a UCL claim. CAL. BUS. & PROF. CODE § 17204. To have standing under the UCL, a party must allege that it has "lost money or property" and demonstrate some economic injury because of the unfair business practice. *Kwikset Corp. v. Superior Ct.*, 51 Cal. 4th 310, 324-27 (2011). The standing requirement is not "a substantial or insurmountable hurdle," rather it is sufficient if "a party has alleged or proven a personal, individualized loss of money or property in any nontrivial amount, he or she has also alleged or proven injury in fact." *Id.* at 325. Economic injuries are "not limited to out-of-pocket expenditures for which no value has been received, or to objectively determined overpayments." *Cal. Med. Ass'n (CMA) v. Aetna Health of Cal.*, 14 Cal.5th 1075, 1089 (2023).

Rocket argues that CollegeNET lacks standing because the economic injury invoked by CollegeNET—the time, effort, resources, and expense of responding to the audit—is insufficient. According to Rocket, because the parties' Agreement expressly permitted Rocket to hire an

independent auditor and CollegeNET has not shown how its audit caused any greater amount of time, effort, resources, and expense than a typical audit would otherwise cost.

That argument, however, is contrary to the California Supreme Court's recent rejection of a similar argument. In *CMA*, the court held that CMA's diversion of staff time and resources to respond to Aetna's alleged unfair business practice sufficiently established an economic injury for standing under the UCL. 14 Cal.5th at 1089-90. The court reasoned that, although CMA's employees were salaried and would have received the same amount of pay no matter how their time was spent, "the economic value CMA received from their labor was reduced" and that CMA lost money "when its personnel were diverted from their other activities" supporting its physician members. *Id.* at 1089; *accord Animal Legal Def. Fund v. LT Napa Partners LLC*, 234 Cal.App.4th 1270, 1283-84 (2015) (providing that diversion organization's resources alleged sufficient economic injury for standing under UCL).

As in *CMA*, even if Rocket legitimately sought an audit under the terms of the contract, CollegeNET alleges that Rocket invoked the audit provision in bad faith – the only time in its 26-year contract history – causing it to divert resources away from its regular business operations. This court may reasonably infer that the economic value CollegeNET received from its employees was reduced because personnel were diverted from their regular business activities to respond to the alleged sham audit. CollegeNET's assertion that it "lost money" by diverting time, expense, and effort to respond to Rocket's bad faith, sham audit sufficiently states an identifiable economic injury based on Rocket's unfair business practice to satisfy the UCL's standing requirement.[3]

---

[3]     CollegeNET has satisfied the more stringent UCL standing requirement; therefore, it has

The court requested additional briefing to address a different aspect of UCL standing as stated in *Linear Tech. Corp. v. Applied Materials, Inc.*, 152 Cal.App.4th 115, 135 (2007). In *Linear Tech*, the court held that where UCL actions are "based on contracts not involving either the public in general or individual consumers who are parties to the contract, a corporate plaintiff may not rely on the UCL for the relief it seeks." *Id.*; *see also Open Text, Inc. v. Northwell Health, Inc.*, Case No. 2:19-cv-09216-SB-AS, 2021 WL 1235254, at *2 (C.D. Cal. Feb. 19, 2021) ("a UCL claim fails if it lacks any connection to the protection of fair competition or the general public"). Having reviewed the parties' supplemental briefing and hearing their arguments, the court concludes *Linear Tech* is distinguishable from this action. In *Linear Tech*, Linear brought its UCL claim under the unfair prong and was seeking to bring its UCL claim on behalf of other customers. *Id.* As discussed below, because CollegeNET adequately states a claim under the unlawful prong and is not pursuing its UCL counterclaim on behalf of others, the court is satisfied that CollegeNET sufficiently has alleged UCL standing to survive the pleading stage.

### 2.    UCL Claims

Because § 17200 "is written in the disjunctive, 'a business act or practice need only meet one of the three criteria – unlawful, unfair, or fraudulent – to be considered unfair competition under the UCL.'" *In re Actimmune Mktg. Litig.*, Case No. C 08-02376 MHP, 2009 WL 3740648,

---

satisfied Article III standing. *See Federal Election Comm'n v. Cruz*, 596 U.S. 289, 296 (2022) (stating that to show standing a "plaintiff must show (1) an injury in fact, (2) fairly traceable to the challenged conduct of the defendant, (3) that is likely to be redressed by the requested relief").

at \*7 (N.D. Cal. Nov. 6, 2009) (quoting *Daro v. Superior Court*, 151 Cal.App.4th 1079, 1093 (2007)), *aff'd*, 464 F. App'x 651 (9th Cir. 2011). Although the remedies available under the UCL "are limited to injunctive relief and restitution, the law's scope is 'sweeping.'" *Gutierrez v. Wells Fargo Bank, NA*, 704 F.3d 712, 717 (9th Cir. 2012) (quoting *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal.4th 163, 180 (1999)). "The UCL was enacted 'to protect . . . consumers and competitors by promoting fair competition in commercial markets for goods and services.'" *Linear Tech.*, 152 Cal.App.4th at 135 (quoting *Kasky v. Nike, Inc.*, 27 Cal.4th 939 (2002)). It is "sweeping, embracing anything that can properly be called a business practice and at the same time is forbidden by law." *Cel-Tech*, 20 Cal.4th at 180.

Rocket asserts that CollegeNET has failed to plead a violation under any prong, and the UCL counterclaim must be dismissed. According to CollegeNET, it adequately pleads a UCL counterclaim under each prong. The court addresses each prong separately.

a.    unlawful

To state a claim under the unlawful prong of § 17200, a plaintiff must allege that the defendant has engaged in a business practice forbidden by law, "be it civil or criminal, federal, state, or municipal, statutory, regulatory, or court-made." *Saunders v. Superior Court*, 27 Cal.App.4th 832, 838-39 (1994). Section 17200 "borrows" violations of other laws and treats them as unlawful business practices that are independently actionable. *Id.* at 839.

CollegeNET argues that common law claims may serve as a predicate for a UCL claim under the unlawful prong, including claims for breach of the implied covenant of good faith and fair dealing. *Mercado v. Allstate Ins.,* 340 F.3d 824, 828 n.3 (9th Cir. 2003) ("California courts have not foreclosed common law theories as a basis for actions pursuant to § 17200."); *Gabana*

*Gulf Distrib. Ltd. v. GAP Int'l Sales, Inc.*, Case No. C 06-02584 CRB, 2008 WL 111223, at *10 (N.D. Cal. Jan. 9, 2008) (denying summary judgment on UCL claim, stating that courts "have not yet foreclosed common law theories – such as breach of the covenant of good faith – as a basis" for UCL actions"), *aff'd*, 343 Fed. App's 258 (9th Cir. 2009). CollegeNET alleges in its counterclaim that there was a valid and enforceable contract, that it met all or substantially all of its obligations under that contract, and that Rocket breached the implied covenant by undertaking an audit in bad faith by misrepresenting the nature of the audit, providing false and unreasonable premises to the third-party auditor, and using the audit results to demand extra royalty payments. (Answer & Countercl. ¶¶ 42-55.) CollegeNET contends that because Rocket has not moved to dismiss the implied covenant counterclaim, Rocket implicitly acknowledges that its breach of the implied covenant claim is adequately pleaded. In CollegeNET's view, because it has adequately pleaded a common law claim for breach of the implied covenant, it has sufficiently stated a UCL claim under the unlawful prong, relying on *Nestlé USA, Inc. v. Crest Foods, Inc.*, LA CV16-07519 JAK (AFMx), 2017 WL 3267665, at *20 (C.D. Cal. July 8, 2017), and *CRST Van Expedited, Inc. v. Werner Enters., Inc.*, 479 F.3d 1099, 1107 (9th Cir. 2007). The court is unconvinced.

The Ninth Circuit has recognized that satisfying the pleading requirements of a common law violation, such as breach of contract, alone is not enough to support a UCL claim under the unlawful prong. *Shroyer v. New Cingular Wireless Servs.*, 622 F.3d 1035, 1044 (9th Cir. 2010).[4]

---

[4]    The court finds CollegeNET's reliance on *Mercado* and *Gabana* misplaced. Although *Mercado* and *Gabana* state that common law claims, such as breach of the implied covenant of good faith and fair dealing, may serve as predicates for UCL liability, they do not state that adequately pleading an implied covenant claim automatically satisfies the pleading requirements for a UCL claim under the unlawful prong.

Instead, to satisfy the unlawful prong, the common law claim also must allege that the business practice is "forbidden by law." *Id.*; *Cel-Tech*, 20 Cal.4th at 180 (stating the UCL's "coverage is sweeping, embracing anything that can properly be called a business practice and that at the same time is forbidden by law") (internal quotations and citation omitted). As Rocket correctly argues, CollegeNET has not identified any predicate law or business practice Rocket undertook that is unlawful – civil, criminal, or regulatory – beyond the breach of the implied covenant claim itself. Thus, under *Shroyer*, the common law violation alleged here fails to plead that Rocket's conduct was forbidden by law.

The court finds *Nestlé* and *CRST* distinguishable from the breach of the implied covenant counterclaim alleged here. In *Nestlé*, the court denied a motion to dismiss a breach of the implied covenant of good faith and fair dealing claim where Crest alleged that Nestle USA conducted audits in bad faith, that the audits exceeded the scope of the parties' contract, and that the audits were performed to force Crest into selling its franchises to Nestlé at a discount. *Nestlé*, 2017 WL 3267665, at *11. The *Nestlé* court also denied a motion to dismiss the UCL claim, concluding that Crest sufficiently alleged that Nestlé USA breached its duty of good faith and fair dealing, and that "as pleaded, it states a claim under the *unfairness* prong of the UCL." *Id.* at *20 (emphasis added). Contrary to CollegeNET's assertion, the *Nestlé* court did not conclude that simply because the implied covenant claim was sufficiently pleaded that Crest also adequately pleaded a UCL claim under the unlawful prong; instead, the UCL claim permitted there arose under the unfairness prong.

And in *CRST*, Werner Enterprises alleged that CRST interfered with its employment contracts by soliciting and hiring away its truck drivers after CRST invested money and time

training those drivers. *CRST*, 479 F.3d at 1102-03. The *CRST* court found that the allegations of intentional interference by a corporate competitor with CRST's employment contracts was "a tortious violation of duties imposed by law," and therefore, stated a UCL claim under the unlawful prong. *Id.* at 1107. Unlike the situation in *CRST*, CollegeNET's allegations of bad faith, sham audits conducted by Rocket to demand extra royalty payments do not involve tortious interference between corporate competitors.

Therefore, as currently alleged, CollegeNET's counterclaim does not identify conduct or business practices by Rocket that are unlawful beyond the common law breach of the implied covenant of good faith and fair dealing claim itself. Accordingly, CollegeNET has failed to state a claim under the unlawful prong of the UCL; Rocket's motion to dismiss on this basis should be granted with leave to amend. *Shroyer*, 622 F.3d at 1044.

      **b.    unfair**

The UCL does not define unfair. "[A] business practice may be 'unfair' and therefore illegal under the UCL, 'even if not specifically proscribed by some other law.'" *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1000 (9th Cir. 2023) (quoting *Cel-Tech*, 20 Cal.4th at 180), *cert. denied*, 144 S. Ct. 682 (2024); *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1143 (2003). The definition of "unfair" is currently "in flux" among California courts. *Chauhan v. Google LLC*, Case No. 23-cv-00702, 2023 WL 5004078, at *4 (N.D. Cal. Aug. 4, 2023). The unfair prong under the UCL is "intentionally framed in its broad, sweeping language, precisely to enable judicial tribunals to deal with the innumerable new schemes which the fertility of man's invention would contrive." *Cel-Tech*, 20 Cal. 4th at 180 (internal quotation and citation omitted). Courts within the Ninth Circuit use two tests recognized by the California Supreme Court to

assess unfairness: the balancing test, which focuses on consumers, and the tethering test, which focuses on competitors. *Epic Games*, 67 F.4th at 1000. The balancing test defines "unfair" as prohibiting conduct that is "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers" and requires the court to "weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim." *Bardin v. DaimlerChrysler Corp.*, 136 Cal.App.4th 1255, 1260 (2006); *Progressive W. Ins. v. Superior Court*, 135 Cal.App.4th 263, 286 (2005). The tethering test defines an "unfair" practice as conduct that "threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Epic Games*, 67 F.4th at 1000 (quoting *Cel-Tech*, 20 Cal.4th at 186-87). Because CollegeNET specifically relies on the balancing test in its briefing and has not pleaded a violation of the text, policy, or spirit of an antitrust law that could satisfy the tethering test, the court addresses only the balancing test.

Rocket contends that CollegeNET has not pleaded how its use of the contractual audit provision is "unfair" under the balancing test. In Rocket's view, CollegeNET's allegations that the it undertook the audit using false and unreasonable assumptions is merely a disagreement about the proper interpretation of the parties' contract. (Pl.s' Mot. Dismiss at 10, ECF No. 30). CollegeNET responds that Rocket used bad faith, sham audits to demand additional royalty payments and that its counterclaim alleges more than just a breach of contract. CollegeNET also contends that the balancing test is fact intensive and is best resolved at summary judgment, not the pleading stage.

CollegeNET's allegations satisfy the balancing test here. CollegeNET alleges that Rocket invoked the audit provision in bad faith, it supplied KPMG with false and unreasonable assumptions, and did so to extract additional royalty payments at the sunset of their contractual relationship. CollegeNET asserts that Rocket has used the "practice of sham audits to shake down" other Uniface customers and identifies three other cases brought in Delaware and Michigan. (Answer & Countercl. ¶¶ 57-58.) According to CollegeNET, Rocket's practice of forcing its customers to participate in the sham audits based on unreasonable premises is an unfair business practice. As in *Nestlé*, CollegeNET pleads factual allegations suggesting that Rocket's conduct – when viewed in the light most favorable to CollegeNET – is "immoral, unethical, oppressive, unscrupulous or substantially injurious" and that the injury to CollegeNET outweighs the utility to Rocket. Thus, CollegeNET states a claim under the unfair prong of the UCL. *Nestlé*, 2017 WL 3267665, at *20 (concluding that allegations that audits conducted in bad faith and to force Crest into selling its franchises at a discount stated a claim under unfair prong of UCL). *See also Epic Games*, 67 F.4th at 1000 (noting that the UCL's three-prong structure permits business practices to be "unfair" even if not proscribed by some other law).

Accordingly, Rocket's motion to dismiss CollegeNET's counterclaim on the unfair prong of the UCL should be denied.

### c.    fraudulent

"A business practice is fraudulent under the UCL if members of the public are likely to be deceived." *Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1169 (9th Cir. 2012); *McGinity v. Procter & Gamble Co.*, 69 F.4th 1093, 1097 (9th Cir. 2023); *Bardin*, 136 Cal.App.4th at 1261 (stating that UCL "fraud" prong requires that members of the public are likely to be deceived by

the challenged conduct). If a plaintiff has alleged a "unified course of fraudulent conduct," then Federal Rule of Civil Procedure 9(b)'s heightened pleading requirement applies to that UCL claim. *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1127 (9th Cir. 2009).

Rocket argues that CollegeNET's allegations that it made "false and unreasonable assumptions" are not pleaded with the specificity required by Rule 9(b). Rocket also contends that CollegeNET fails to allege that it relied on those false and unreasonable assumptions to its detriment. CollegeNET responds that its allegations about Rocket's misrepresentations and failure to disclose the true nature of the audit are sufficient because the pleading standards for fraud are relaxed when the information is known only to the opposing party, and that its reliance may be inferred at the motion to dismiss stage. CollegeNET also submits that its allegations provide Rocket with enough detail to adequately prepare an answer and that the motion should be denied.

Although the parties' arguments focus on the specificity of the allegations and reliance, the court concludes that the UCL counterclaim under the fraudulent prong fails for a different reason: CollegeNET fails to assert any facts supporting an inference of public deception. CollegeNET alleges the following were fraudulent acts:

a. invoking its contractual audit provision with the intent of providing its independent auditors with false information and unreasonable assumptions;

b. invoking the contractual audit provision knowing that it was going to use the audit results based on incorrect and unreasonable premises to demand additional payment from its customers;

c. providing its independent auditors with false information and unreasonable assumptions and/or failing to correct the independent auditors' reliance on false information and unreasonable assumptions; and

d. using the audit results based on these incorrect and unreasonable premises to demand additional payment from its customers that were not called for under the agreements; and

e. misrepresenting the nature of its audits.

(Answer & Countercl. ¶ 77.)

Absent from those assertions, however, is how Rocket's alleged wrongdoing has some effect on the public. *Cappella Photonics, Inc. v. Cisco Sys., Inc.*, 77 F. Supp. 3d 850, 865 (N.C. Cal. 2014); *Nat'l Rural Telecomm. Co–op. v. DIRECTV*, 319 F. Supp. 2d 1059, 1077 (C.D. Cal. 2003). "A plaintiff must plead and prove harm to the public as a prerequisite to succeed on a UCL claim under the fraudulent prong." *Linde, LLC v. Valley Protein, LLC*, Case No. 1:16-cv-00527-DAD-EPG, 2019 WL 3035551, at *20 (E.D. Cal. 2019); *Watson Labs., Inc. v. Rhone-Poulenc Rorer, Inc.*, 178 F. Supp. 2d 1099, 1120-21 (C.D. Cal. 2001) (stating that fraudulent prong of § 17200 requires "a showing that the public, rather than merely the plaintiff, is likely to be deceived"); *Facebook, Inc. v. Brandtotal Ltd.*, Case No. 20-cv-07182-JCS, 2021 WL 2354751, at *17 (N.D. Cal. June 9, 2021) ("Brandtotal cannot state a claim under the fraudulent prong of the UCL without showing a likelihood that members of the public would be deceived[.]"); *Travelers Prop. Cas. Co. of Am. v. Centex Homes*, No. 11-3638-SC, 2013 WL 4528956, at *5 (N.D. Cal. Aug. 26, 2013) (providing that to bring a "fraudulent" UCL claim, party "must show that the alleged wrongdoing as some impact on the general public.").

CollegeNET does not allege that the false statements harmed KPMG, the independent auditor, or were likely to deceive members of the public. CollegeNET does accuse Rocket of "shaking down" Manhattan Software Group, ComSpec International, Inc., Sadler-Necamp Financial Services, Inc. (dba Proware), and Citibank by using similar sham audits to recover

additional royalties under reseller agreements. (*Id.* ¶ 57(a)-(d).) Yet those entities also are alleged to have VAR contracts with Rocket, and therefore, CollegeNET has not alleged how members of the public have been deceived by Rocket's actions. Nowhere does CollegeNET allege that the public at large is likely to be deceived by Rocket's invocation of contractual audit provisions. *See Nat'l Rural Telecomms.*, 319 F. Supp. 2d at 1077-78 (granting summary judgment on UCL fraud claim because plaintiffs did not show that "the public was impacted at all by DIRECTV's alleged actions"); *Travelers Prop.*, 2013 WL 4528956, at *5 (stating that absent showing effect on public, party fails to state UCL claim on fraud prong). This is fatal to CollegeNET's claim under the fraudulent prong.

In sum, Rocket's motion to dismiss CollegeNET's UCL counterclaim on the fraudulent prong should be granted with leave to amend.

### 3. Remedies under § 17200 and Motion to Strike

Remedies under the UCL generally are limited to injunctive relief and restitution. *Cel-Tech Commc'ns*, 20 Cal.4th at 179. "A UCL action is equitable in nature; damages cannot be recovered." *Korea Supply Co.*, 29 Cal.4th at 1144.

Rocket argues that CollegeNET is not entitled to restitution or injunctive relief under the UCL and that the UCL counterclaim should be dismissed with prejudice. Rocket maintains that CollegeNET refused to pay the royalties it demanded after the audit and, therefore, there is no basis to award restitution. Rocket further contends CollegeNET is not entitled to injunctive relief because Rocket's audit is completed and there is no risk of future audits because that right did not survive the Agreement's expiration, which occurred on December 31, 2020.

As CollegeNET correctly argues, it alleges that the parties' Agreement spanned from 1994 to 2020, and that Rocket has exercised its audit rights only for the years 2017 to 2019. As alleged, Rocket could seek to enforce its audit rights for other years and thus, CollegeNET's request for injunctive relief pleads a valid remedy under the UCL.

In its reply, Rocket contends that Section 3.6 of the Agreement does not provide for survival of its audit rights and attaches an Agreement between the parties to the declaration of Theresa Wang. (Decl. Theresa H. Wang, ECF No. 40.) Rocket insists that the "notion that CollegeNET could be harmed by a future audit has no basis – the parties' contract ended and Rocket can no longer invoke a right to audit CollegeNET." (Pl.'s Reply at 3, ECF No. 39.) CollegeNET moves to strike the new evidence in Wang's declaration and several arguments advanced by Rocket in its reply. (Def.'s Mot. Strike at 1-2, ECF No. 43.)

The court should grant the motion to strike for two primary reasons. First, Rocket did not address the interpretation of section 3.6 of the Agreement in its motion to dismiss and failed to submit Wang's declaration as support for that motion and, therefore, the argument is not properly before the court. *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief."). Second, the court seldom considers materials beyond the pleadings when resolving a Rule 12(b)(6) motion. *Lee v. City of L.A.*, 250 F.3d 668, 688 (9th Cir. 2001). A court may consider documents outside the pleadings under the incorporation by reference doctrine, as Rocket encourages the court do with the Agreement here. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998, 1002-03 (9th Cir. 2018) (discussing incorporation by reference doctrine, noting that "the unscrupulous use of extrinsic documents to resolve competing theories against [a counterclaim] risks premature

Page 19  – FINDINGS AND RECOMMENDATION

dismissals of plausible claims that may turn out to be valid after discovery"). The court declines to do so.

The parties' dispute not only the interpretation of the audit provisions, but also whether the document attached to Wang's declaration governed the parties' agreement during the relevant timeframe. Because interpretation of the audit provisions in the Agreement will be central to resolving this action, it would be improper to consider the late-submitted evidence on a motion to dismiss. *Id.* at 1003 (stating that "it is improper to assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well-pleaded complaint"). Consequently, the court should grant the motion to strike and decline to consider Wang's declaration and Exhibit A.[5]

In short, CollegeNET has adequately pleaded a remedy available under the UCL and CollegeNET's motion to strike should be granted.

/ / / / /

/ / / / /

/ / / / /

/ / / / /

/ / / / /

/ / / / /

/ / / / /

/ / / / /

---

[5]    The court rejects CollegeNET's second and third bases for striking certain arguments in Rocket's reply. The court finds that Rocket adequately presented futility and the unlawful prong in its motion to dismiss. Accordingly, CollegeNET's motion to strike on those reasons should be denied.

**CONCLUSION**

For the reasons stated, Rocket's Motion to Dismiss CollegeNET's counterclaim (ECF No. 30) should be DENIED, and CollegeNET's Motion to Strike (ECF No. 43) should be GRANTED.

**SCHEDULING ORDER**

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due within 14 days. If no objections are filed, the Findings and Recommendation will go under advisement on that date. If objections are filed, a response is due within 14 days. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED: September 30, 2024.

_____/s/Jeff Armistead_____
JEFF ARMISTEAD
United States Magistrate Judge