IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


ROCKET SOFTWARE, INC., a Delaware
corporation, and ROCKET SOFTWARE B.V.,
a Netherlands private limited company,

      Plaintiffs/Counter-
      Defendants,

  v.

COLLEGENET, INC., a Delaware corporation,

      Defendant/Counter-
      Claimant.

Case No. 3:22-cv-00327-AB

OPINION & ORDER

John Thomas Fetters
Theresa H. Wang
Bradford J. Axel
Joshua Harms
Shannon M. Jost
Valerie Walker
Stokes Lawrence, P.S.
1420 5th Avenue Suite 3000
Seattle, WA 98101

    Attorneys for Plaintiffs

1 – OPINION & ORDER

Alexis Paschedag Federico
Michael Roy Williams
Sheila Mojtehedi
Bienert Katzman Littrell Williams LLP
903 Calle Amanecer Suite 350
San Clemente, CA 92673-2021

Elliott J. Williams
Steven T. Lovett
Stoel Rives LLP
760 S.W. Ninth Ave. Suite 3000
Portland, OR 97205

      Attorneys for Defendant


**BAGGIO, District Judge:**

Plaintiffs Rocket Software Inc. and Rocket Software B.V.[1] bring this suit against

Defendant CollegeNET, Inc. alleging breach of contract. Final Pretrial Order ("PTO") 5, ECF

No. 119. Defendant counterclaims for breach of the implied covenant of good faith and fair

dealing and for violation of California's Unfair Competition Law. *Id.* at 12, 14.

Plaintiffs move to exclude Defendant's rebuttal expert. Pls.' Mot. Exclude ("Pls.' Mot."),

ECF No. 120. The Court held oral argument on November 19, 2025. For the following reasons,

the Court grants in part and denies in part Plaintiffs' Motion.

## BACKGROUND

For twenty-six years—between 1994 and 2020—Plaintiffs licensed their software to

Defendant under consecutive Value Added Reseller Agreements ("VAR Agreements" or

"Agreements"). PTO 3–4. These Agreements allowed Defendant to "develop and deploy

---

[1] Plaintiffs Rocket Software Inc. and Rocket Software B.V. acquired Uniface, the
software developer named in the relevant contracts, in 2021; Plaintiffs are successors in interest
to Uniface. Final Pretrial Order ("PTO") 3, ECF No. 119.

applications incorporating [Plaintiffs'] software that [Defendant] in turn sold to its customers."
*Id.* at 4. In other words, software developer Plaintiffs licensed software products to software
developer Defendant, and then Defendant sublicensed those products to Defendant's end-user
customers.

In exchange for the rights to sublicense Plaintiffs' software, Defendant agreed to pay two
fees to Plaintiffs calculated as percentages of the fees Defendant charged its end-user customers.
*Id.* The parties use different terminology for these fees. In Plaintiffs' description, "[Defendant]
agreed to pay [Plaintiffs] royalties on license fees and support/maintenance fees pursuant to the
VAR Agreement[,]" noting that "[Plaintiffs] received far more when [Defendant] reported its
invoicing to customers as license fees, rather than support/maintenance fees." Pls.' Mot. 2.
In Defendant's description, "[Defendant] paid [Plaintiffs] higher percentages on its one-time
up-front fees (referred to as 'Basic' or 'Initial' fees), and a lower percentage on its secondary,
recurring fees (referred to [as] 'Annual' or 'Quarterly' fees)." Def.'s Resp. Opp'n Pls.' Mot.
Exclude ("Def.'s Resp.") 2, ECF No. 123. Defendant submitted quarterly royalty reports to
Plaintiffs throughout their relationship. PTO 4.

During their relationship, and in Defendant's version of events, "beginning no later than
2004," Defendant "migrated its products from an installed model, under which its software was
installed on its customer's servers, to a Software as a Service [("SaaS")] model . . . ." *Id.* at 7.
The parties do not dispute the occurrence of this migration but instead dispute whether Plaintiffs
were aware of the transition and, consequently, whether Defendant "inaccurately reported license
sales as service fees for support/maintenance . . . ." *Id.* at 6.

The VAR Agreements provided Plaintiffs with the right to audit Defendant. *Id.* at 2. In
2019, Plaintiffs hired an outside auditor, KPMG, who performed an audit of Defendant's

records. *Id.* at 5. Following the audit, Plaintiffs demanded additional fees, arguing that the audit

revealed Defendant had "underreported and underpaid" fees. *Id.* at 2, 5. Defendant declined,

contending that the audit was conducted in bad faith and that it has paid all sums owed. *Id.*

## STANDARDS

Federal Rule of Evidence ("FRE") 702 governs the admissibility of expert testimony. The

Rule provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or
> education may testify in the form of an opinion or otherwise if . . . :
> (a) the expert's scientific, technical, or other specialized knowledge will help the
>     trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods
>     to the facts of the case.

Fed. R. Evid. 702.

Interpretation of FRE 702 is guided by the decisions in *Daubert* and *Daubert II. Daubert*

*v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) ("*Daubert*"); *Daubert v. Merrell Dow*

*Pharms., Inc.*, 43 F.3d 1311 (9th Cir. 1995) ("*Daubert II*"). "Under *Daubert* and its progeny,

including *Daubert II*, a district court's inquiry into admissibility is a flexible one." *City of*

*Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1043 (9th Cir. 2014) (citing *Alaska Rent-A-Car,*

*Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013)). The district court's role is one

of "a gatekeeper, not a fact finder." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010)

(quoting *United States v. Sandoval-Mendoza*, 472 F.3d 645, 654 (9th Cir. 2006)). The purpose is

"to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because

they are impeachable. The district court is not tasked with deciding whether the expert is right or

wrong, just whether his testimony has substance such that it would be helpful to a jury." *Alaska*

*Rent-A-Car*, 738 F.3d at 969–70.

## DISCUSSION

In anticipation of trial, Plaintiffs retained two experts and Defendant retained one expert. Plaintiffs offer Dr. Steven Kursh as a software licensing expert, Wang Decl. Ex. A ("Kursh Report"), ECF No. 122-1, and Christian Tregillis as a damages expert, Wang Decl. Ex. B ("Tregillis Report"), ECF No. 122-2. In rebuttal, Defendant offers Robert Held as a software licensing expert. Wang Decl. Ex. D ("Held Report"), ECF No. 122-4.

Plaintiffs challenge Mr. Held on qualifications, reliability of methods, impermissible contract interpretation, state of mind and invasion of fact-finding, and bolstering grounds. Pls.' Mot. Defendant opposes each ground and objects to evidence in Plaintiffs' exhibits. Def.'s Resp.; Def.'s Obj. Pls.' Evid. ("Def.'s Obj."), ECF No. 126. The Court will address each in turn.

## I.    Qualifications to Opine on Audit

While Plaintiffs do not challenge Mr. Held's software licensing qualifications, Plaintiffs challenge Mr. Held's opinions on the integrity/bias of the KPMG audit, Held Report ¶¶ 124–139, for lack of audit qualifications, Pls.' Mot. 7. Plaintiffs argue Mr. Held is "not qualified to opine on the standards for third-party auditors, nor the extent to which KPMG acted consistently with such standards." *Id.* Plaintiffs reason that Mr. Held has no training or experience in auditing and Mr. Held admitted in deposition that auditing "wasn't a regular part of [his software licensing] business." *Id.* (quoting Wang Decl. Ex. C ("Held Dep.") 249:10–19, ECF No. 122-3). Defendant counters that, in his software licensing career, Mr. Held has "drafted hundreds of audit clauses[,] . . . personally triggered audits when he was a licensor[,] and reviewed [audit] reports to determine adherence to the licensing agreements." Def.'s Resp. 9.

A witness who will offer expert opinion testimony must be "qualified as an expert by knowledge, skill, experience, training, or education . . . ." Fed. R. Evid. 702. "Rule 702

'contemplates a *broad conception* of expert qualifications.'" *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1015 (9th Cir. 2004) (quoting *Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1269 (9th Cir. 1994)). Indeed, "courts impose no requirement that an expert be a specialist in a given field" or possess "[l]icensure in the discipline or speciality which is the subject of expert opinion . . . ." *Doe v. Cutter Biological, Inc.*, 971 F.2d 375, 385, 385 n.11 (9th Cir. 1992). However, there "may be a requirement that he or she be of a certain profession . . . ." *Id.* at 385.

Here, by all accounts, Mr. Held is not an auditor. *See* Held Report ¶ 2 (noting Mr. Held's expertise "within the computer software industry"). The cases cited by Defendant in support of permitting Mr. Held free rein to opine on auditing share one unpersuasive trait in common: they permit testimony from witnesses who possess expertise in the profession even if not in a certain specialty. *United States Fid. & Guar. Co. v. Ulbricht*, 576 F. Supp. 3d 850, 860 (W.D. Wash. 2021) (admitting expert with twenty years' experience in the insurance industry over arguments that expert was unqualified because he "lack[ed] experience with cases specifically involving a lost [insurance] policy"); *United States v. Garcia*, 7 F.3d 885, 889–90 (9th Cir. 1993) (finding no error in permitting testimony of child mental health specialist even though the specialist lacked "particularized expertise" on the subject of child testimony in court); *Bordelon v. Airgas USA, LLC*, 603 F. Supp. 3d 946, 953–54 (D. Or. 2022) (admitting emergency doctor who was not a "neurologist, cardiologist, sleep specialist, or any type of specialist" because the fact "that [an expert] is not a specialist in a certain field goes to weight, not admissibility"); *Hangarter*, 373 F.3d at 1015–16 (finding no error in admitting twenty-five-year veteran of insurance industry even though he allegedly lacked expertise on claims adjustment standards in the context of an insurance bad faith claim). In all of these cases, the expert may not have possessed the particular

specialty at issue but was a member of the relevant profession. These cases thus have limited purchase for the proposition that Mr. Held be allowed free rein to opine about auditing despite not being an auditor.

Aside from the caselaw, Defendant urges a re-framing of the issue—that "Mr. Held evaluated, from a licensing-industry vantage point, whether the audit process and interactions aligned with customary practices for 'independent' license-audit engagements in software licensing contexts." Def.'s Resp. 10. Plaintiffs in Reply argue that perhaps this vantage point qualifies Mr. Held to opine "about [Plaintiffs'] *initiation* of the audit, but that is distinct from what Mr. Held actually opined on: which is *how KPMG conducted itself* . . . ." Pls.' Reply Supp. Pls.' Mot. ("Pls.' Reply") 2, ECF No. 127.

The Court declines to wholly prevent Mr. Held from opining on the audit but limits the scope of his testimony. Mr. Held may testify to the manner in which Plaintiffs utilized the audit provision or how KPMG conducted itself was consistent with or deviated from Mr. Held's interactions with auditors from his software licensing experience. *E.g.*, Held Report ¶ 124 ("I disagree that [Plaintiffs] utilized the audit provision consistent with industry norms."). Mr. Held may further discuss communications between Plaintiffs and KPMG in the context of his experience communicating with software licensing auditors. *E.g.*, *id.* ¶ 134. However, because Mr. Held is not an auditor and has never performed audits, he is barred from offering conclusory opinions on best practices for auditing or on the integrity of the instant audit. *E.g.*, *id.* ¶ 20 ("KPMG did not act as an unbiased auditor . . . ."); *id.* ¶ 130 ("[T]he best practices for achieving an unbiased audit requires . . . ."); *id.* ¶ 132 ("[I]t is my professional opinion that the KPMG audit lacked the hallmarks of an unbiased, independent audit.").

//

The Court recognizes this is a fine line. Mr. Held's opinions on how this record deviates from his past experiences dealing with software licensing auditors may abut impermissible opinions about audit methods. For now, the Court emphasizes that conclusory statements about auditing, audit best practices, or audit integrity are beyond Mr. Held's qualifications.

## II.    Reliability of Methodology

Plaintiffs move to exclude Mr. Held's opinions on unreliability grounds. First, Plaintiffs argue that Mr. Held failed to understand the significance of shifting revenue proportions and thus "cannot be considered reliable." Pls.' Mot. 8–11. Second, Plaintiffs move to exclude Mr. Held's opinion regarding mandatory maintenance/support fees in a twofold argument: (i) Mr. Held ignores language in Defendant's end user agreements, *id.* at 11–14; and (ii) Mr. Held's citations for industry customs are unreliable, *id.* at 14.

Expert opinion testimony "is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Alaska Rent-A-Car*, 738 F.2d at 969 (quoting *Primiano*, 598 F.3d at 565). "The test for reliability . . . 'is not the correctness of the expert's conclusions but the soundness of his methodology.'" *Stilwell v. Smith & Nephew, Inc.*, 482 F.3d 1187, 1192 (9th Cir. 2007) (citing *Daubert II*, 43 F.3d at 1318). "For non-scientific testimony, such as testimony about industry practices and standards, reliability often cannot be measured by examining the methodology, theories, or technical framework supporting the opinion. Rather, reliability is more dependent on the knowledge and experience of the expert." *Snead v. Wright*, 625 F. Supp. 3d. 936, 939 (D. Alaska 2022) (citing *Hangarter*, 373 F.3d at 1017). That said, "nothing in either *Daubert* or the [FRE] requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court

may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

    A.       Billing Structure and Economics of the Relationship

    Plaintiffs argue Mr. Held's opinion that "the billing model generally remained the same" and "the economics generally stayed the same[,]" Held Report ¶¶ 101–106, is unreliable because "Mr. Held did *not* consider the underlying economics of [Defendant's] royalty payments to [Plaintiffs] or how they changed over time[,]" Pls.' Mot. 8–9. To recount the broader dispute at issue, Plaintiffs allege that Defendant "dramatically changed how it was charging its customers by shifting more of its revenue from the Basic/Initial Fee type, for which it would have had to pay a higher percentage, to the Annual/Quarterly Fee type, for which a lower percentage applied." *Id.* at 11.

    In coming to his conclusion that the billing structure and economics of the relationship did not change, Mr. Held relies on deposition testimony from one of Defendant's executives and his review of "various contracts between [Defendant] and its end users from 1994 until 2020[,]" Held Report ¶¶ 103–105. Mr. Held was then asked in his own deposition whether he "look[ed] at any of . . . [Defendant's] end user license agreements or . . . any of [Defendant's] royalty reports *to look at the proportion between the basic fee and the annual fee*." Held Dep. 171:6–11 (emphasis added). Mr. Held responded "[n]o." *Id.* Again, Mr. Held was asked if he "review[ed] any quarterly statements or . . . license agreements *to verify that general relationship between the annual fee and basic fee*?"—"[n]o." Held Dep. 172:1–5 (emphasis added). In light of Mr. Held's deposition answers, Plaintiffs argue "Mr. Held's opinions on this point are completely disconnected from the relevant underlying data and should be excluded accordingly." Pls.' Mot. 11.

The Court draws a distinction between Mr. Held's opinions about the "billing structure" and the "economics of the circumstance for [Plaintiffs.]" *Compare* Held Report ¶¶ 102, 105, *with id.* ¶ 106. The Court permits Mr. Held to testify to the former but not the latter. It appears that Mr. Held's primary opinion—the one stated in the section header of his report and in paragraphs 102 and 105—is that Defendant's billing model vis-à-vis its end user customers generally stayed the same. *See id.* ¶¶ 102, 105. Then, in the final paragraph of the section, Mr. Held expands his scope in opining about "the economics of the circumstances for [Plaintiffs]" as Defendant transitioned to SaaS. *Id.* ¶ 106.

Mr. Held is not unreliable when he opines on the billing structure because Mr. Held reviewed materials relevant to informing this opinion. Plaintiffs acknowledge that "Mr. Held stated that he 'reviewed various contracts between [Defendant] and its end users from 1994 until 2020 . . . .'" Pls.' Mot. 9 (quoting Held Report ¶ 105). Even so, Plaintiffs contend that Mr. Held is unreliable because he did not analyze the materials "to understand whether the proportional relationship between the two types of fees" changed. *Id.* This is a dispute about what constitutes sufficient review—Plaintiffs insist that review of the royalty reports is a prerequisite for reliability about billing with respect to end-users, while Mr. Held found deposition transcripts and contracts sufficient. This is a topic primed for cross-examination, not exclusion. *See Hangarter*, 373 F.3d at 1017 n.14 (holding expert's "selection of documents to review" and "questions regarding the nature of [expert's] evidence went more to the 'weight' of [the expert's] testimony—an issue properly explored during direct and cross-examination").

In contrast to his opinions on the billing structure, Mr. Held outright failed to review materials to offer a reliable global opinion about how Defendant's billing affected Plaintiffs' economics. While contracts between Defendant and Defendant's customers, as well as

deposition transcripts, may undergird an opinion on the billing structure between Defendant and Defendant's customers, there is no indication that these sources directly report *Plaintiffs'* royalty receipts, revenue, or the like. To underscore the issue, quarterly royalty reports were available to Mr. Held. Pls.' Mot. 9. Trial courts properly exclude opinions when they fail to rest upon relevant underlying facts. *See Moussouris v. Microsoft Corp.*, 311 F. Supp. 3d 1223, 1244–47 (W.D. Wash. 2018) (excluding opinion when expert only reviewed 18 of 231 complaints, did not create a representative sample of complaints, and did not interview relevant individuals); *Powell v. Anheuser–Busch Inc.*, No. CV 09-729-JFW (VBKX), 2012 WL 12953439, at *6–7 (C.D. Cal. Sept. 24, 2012) (excluding opinion when it was "imperative that [the expert] review . . . deposition testimony [and he] failed to do so.").

In sum, Mr. Held is permitted to opine on the billing model between Defendant and Defendant's end-users but may not offer opinions on Plaintiffs' economics.

B.    Mandatory Maintenance and Support Fees

Plaintiffs next move to exclude Mr. Held's opinion on mandatory maintenance and support fees. Pls.' Mot. 11–14. Plaintiffs move on two grounds: first, that Mr. Held ignores language in Defendant's end user agreements, *id.* at 11–14; and second, that he cites "two stray websites" for his industry custom assertions, *id.* at 14.

i.    Ignorance of End-User Contract Language

Plaintiffs argue that Mr. Held's opinion that "[t]he annual or quarterly fee is a mandatory maintenance and support fee[,]" Held Report ¶¶ 17, 107–117, is unreliable because it "disregards the express terms of [Defendant's end-user] agreements" and instead relies solely on Mr. Held's *ipse dixit* and appeals to his industry experience. Pls.' Mot. 11–14.

//

When an expert relies upon their experience, the expert "must explain how that experience leads to the conclusions reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 advisory committee's note (2000); *see also Wolff v. Tomahawk Mfg.*, No. 3:21-CV-880-SI, 2025 WL 1555251, at *10–11 (D. Or. June 2, 2025) ("[W]hen an expert is relying on experience, the expert still must render an opinion 'based on sufficient facts or data' that 'is the product of reliable principles and methods.'" (quoting Fed. R. Evid. 702(a)–(b))).

Plaintiffs' deposition of Mr. Held is the animating source of this dispute. Plaintiffs note that "Mr. Held repeatedly confirmed [in deposition] that determining the nature of the annual or quarterly fees necessarily depends upon looking at [Defendant's] end-user agreements." Pls.' Mot. 11–12 (citing Held Dep. 133:25–134:8; 104:3–17; 127:1–10; 165:22–166:2). In deposition, Plaintiffs confronted Mr. Held with the language in an addendum of an end-user contract (i.e., the contract between Defendant and a university customer). *E.g.*, Held Dep. 134:3. The language reads that both the initial fee and the quarterly fee are "for the licensed software and services." *E.g.*, *id.* at 142:4–16; Pls.' Mot. 12. In deposition, Mr. Held states "my understanding with my 25 years of experience in this business is the initial fee is [the] fee for the licensed software. The quarterly fee is for the services." Held Dep. 140:21–24. Further, Mr. Held states that it is his "interpretation that services and maintenance are part and parcel of the same thing. And in my 25 years of experience, they've always been lumped together as M and S, maintenance and service or maintenance and support." *Id.* at 146:21–25. Plaintiffs argue that this reflexive reliance on experience without an explanation of underlying methods, in the face of contrary contract language, renders Mr. Held's opinion unreliable.

However, in following deposition pages, Plaintiffs' counsel continues to press Mr. Held and Mr. Held responds: "[W]e just saw the addendum that we looked at called services, but the MLA, the master licensing agreement which governs as the parent document puts service and maintenance and support all in the same category. . . . [D]id they define a term here that is used differently . . . in the addenda[?]" *Id.* at 165:12–20. This passage indicates that Mr. Held does not solely rely on his *ipse dixit* and appeals to his industry experience, as Plaintiffs portray, but rather Mr. Held has followed his self-proclaimed method of looking at the contracts and coming to conclusions. Because Mr. Held identifies contractual language per his self-proclaimed method, and because a non-scientific expert's "reliability depends heavily on the *knowledge and experience* of the expert," the Court declines to exclude on reliability grounds. *Hangarter*, 373 F.3d at 1017 (citation omitted).[2]

> ii.    Reliance on Stray Websites

Plaintiffs next argue that Mr. Held's opinion that mandatory maintenance fees are common, Held Report ¶¶ 19, 115, is not reliable because Mr. Held cites "two stray websites" in support. Pls.' Mot. 14 (citing Held Report ¶¶ 114–117). Defendant counters that the "stray" websites are websites for "two multinational companies . . . ." Def.'s Resp. 15. Defendant further notes that Plaintiffs' expert Dr. Kursh cites to an "anonymous reviewer's opinion of what constitutes a typical 'term license'" on the website gocardless.com. *Id.* at 15 n.4.

Plaintiffs offer no account of why the websites of multinational companies are inappropriate citations for an expert in articulating industry custom beyond critiquing the fact that Mr. Held only includes two examples. Pls.' Mot. 14. Plaintiffs argue that the examples are

---

[2] The Court will exclude some of the opinions challenged here for impermissible contract interpretation in the following section. *See* Discussion, *infra* Section III.A.

"nothing like the applications at issue here" but do not explain how the cited companies are different or why Mr. Held's citation of them renders him unreliable. *Id.* The Court declines to exclude opinions on this ground.

      C.     The Meaning of a "Sale"

      Plaintiffs argue that Mr. Held's interpretation of the term "sale" to not encompass the secondary fees charged by Defendant, Held Report ¶¶ 118–123, is unreliable and "absurd[,]" Pls.' Mot. 14–15. The Agreement between Plaintiffs and Defendant states: "For clarity, Royalty Fees are due and owed to Uniface B.V. for each sale of the VAR application to an End User, regardless of whether such transaction involves new and/or additional licenses, and regardless if the VAR End User pays VAR." Held Report ¶ 119. Notably, "sale" was not defined in the contract. Def.'s Resp. 17. Plaintiffs' expert opined that the secondary fee charged by Defendant to its end users was a "sale" of a license. *E.g.*, Tregillis Report ¶ 109. Mr. Held disagrees. Held Report ¶ 123.

      Plaintiffs seek to exclude Mr. Held's opinion on the grounds that it ignores plain language and misinterprets "regardless" in the contract language. Pls.' Mot. 14–15. Plaintiffs' experts argue that "regardless" means that royalty fees are due even if the transaction does not involve new or additional licenses. *E.g.*, Tregillis Report ¶ 109 ("[F]or any fees [Defendant] received from its customers that provided a license or access to the software, these fees appear consistent with a 'sale' of a license, indicating that the Royalty Fee rate should be applied . . . ."). The upshot: royalty fees would be due for "both the basic/initial fees and the quarterly/annual fees[]." *Id.* According to Plaintiffs, "regardless" expands the scope of royalty fees—the "regardless" clause means fees are not due solely for new or additional licenses. Pls.' Mot. 14–15.

Mr. Held takes a different view. Over nine pages of deposition transcript, Mr. Held interprets "regardless" as "regardless of whether it's new or additional . . . ." Held Dep. 236:2–245:18. The upshot: "if it's the same license that was put in place before and nothing new or additional was added, [the royalty fee] doesn't apply [to secondary fees]." Held Dep. 236:13–15. According to Mr. Held, the word "regardless" clarifies that royalty fees apply to both new and additional licenses.

Mr. Held's opinion does not reach "unreliable nonsense" as alleged by Plaintiffs. Pls.' Mot. 15 (quoting *Alaska Rent-A-Car, Inc.*, 738 F.3d at 969). The extent of its absurdity, as Plaintiffs allege, is a matter for cross-examination. "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano*, 598 F.3d at 564 (citing *Daubert*, 509 U.S. at 596).

### III. Interpretation of Contract Language

Plaintiffs next move to exclude two opinions put forth by Mr. Held that Plaintiffs consider impermissible interpretation of contract language. Plaintiffs move to exclude Mr. Held's interpretation of select contract terms, Pls.' Mot. 16–17, as well as Mr. Held's opinion about whether KPMG's audit conformed to the contract, Pls.' Mot. 17.

Generally, courts may not admit experts to offer contract interpretations. *Crow Tribe of Indians v. Racicot*, 87 F.3d 1039, 1045 (9th Cir. 1996) ("The interpretation of a contract is an issue of law [and] [e]xpert testimony is not proper for issues of law."). "Thus, an expert may testify to industry custom and usage with respect to particular contract terms, but he or she may not give an opinion on the ultimate contract interpretation issue." *F.B.T. Prods., LLC v. Aftermath Recs.*, No. CV073314PSGMANX, 2009 WL 10671243, at *7 (C.D. Cal. May 12, 2009).

A.     Interpretation of Certain Contract Terms

Plaintiffs argue that Mr. Held's interpretation of "annual or quarterly fee" and "sale of the VAR application[,]" Held Report ¶¶ 17, 121, 123, cross into impermissible contract interpretation. Pls.' Mot. 16–17. Defendant counters that Mr. Held is simply rebutting Plaintiffs' experts doing the same thing. Def.'s Resp. 18 (citing Tregillis Report ¶ 80; Kursh Report ¶¶ 163–167).

Plaintiffs' expert Dr. Kursh writes, "for a Term License each term renewal would result in a new license, rather than being characterized as ongoing 'maintenance,' and royalties should be calculated accordingly." Kursh Report ¶ 164. He further writes that "[e]ach [Defendant] licensee effectively gets a new license at the end of each term . . . ." *Id.* ¶ 165. Plaintiffs' second expert Mr. Tregillis adds "all payments made by [Defendant's] customers provided a license to the . . . software, and any failure to pay such fees would result in loss of access and right to use the . . . software, as dictated by [Defendant's] contracts with its customers." Tregillis Report ¶ 80.

In rebuttal, Mr. Held writes "[Defendant] consistently charged its end-user customers two fees—an upfront fee and a lesser mandatory annual or quarterly fee. The annual or quarterly fee is a mandatory maintenance and support fee." Held Report ¶ 17.

Plaintiffs argue that "Dr. Kursh did not opine that the recurring fees . . . referenced in [Defendant's] agreements with end users must be interpreted as a 'license fee.'" Pls.' Reply 8. While that is close to what Mr. Kursh does when he writes "each term renewal would result in a new license, rather than being characterized as ongoing 'maintenance[,]'" Kursh Report ¶ 164, Mr. Kursh frames it as "explain[ing] the typical result of a term renewal under a Term License Model[,]" Pls.' Reply 9.

This is as much an expert finesse dispute as it is a contract interpretation issue. Dr. Kursh couches his opinion in "the typical result of a term renewal" rather than a conclusory statement. *Id.* In contrast, Mr. Held's statements in paragraph 17, "[t]he annual or quarterly fee is a mandatory maintenance and support fee[,]" as well as paragraph 123, "[t]he plain language of the 2018 Amendment[,]" are blatant conclusory interpretations not couched in industry custom. Held Report ¶¶ 17, 123. Mr. Held may offer opinions on industry custom and how the parties' conduct is consistent with or deviates from that custom, but he may not offer conclusory interpretive opinions.

### B.    Interpretation of Audit Breach

Plaintiffs complain of the following opinion by Mr. Held: "KPMG did not act as an unbiased auditor, *as the parties' agreement requires*, but instead acted as an advocate for [Plaintiffs]." Held Report ¶ 20 (emphasis added); Pls.' Mot. 17. The Court has already excluded the first clause of this sentence. *See* Discussion, *supra* Section I. To the extent it is relevant at trial for other contract interpretation disputes, Defendant in briefing indicated a willingness to strike the italicized phrase, Def.'s Resp. 19, and Defendant in oral argument confirmed this position. Because the contract interpretation refers to the already excluded clause, this issue is otherwise resolved.

## IV.    State of Mind and Invasion of Fact-finding

Plaintiffs move to exclude Mr. Held's opinion about Plaintiffs' knowledge of Defendant's transition to SaaS as impermissible opining on state of mind, Pls.' Mot. 18–19; to exclude Mr. Held's opinion of excerpted communications between Plaintiffs and KPMG as an invasion of the province of the fact-finder, *id.* at 19; and to generally exclude Mr. Held's commentary on the parties' course of conduct, *id.* at 19–20.

A.      Plaintiffs' Knowledge of Defendant's Transition to SaaS

Plaintiffs move to exclude Mr. Held's opinions about Plaintiffs' knowledge of
Defendant's transition to SaaS, Held Report ¶¶ 87–96, because it impermissibly speaks to
Plaintiffs' knowledge. Pls.' Mot. 18–19. Defendant argues that this is direct rebuttal evidence
that will help the jury. Def.'s Resp. 20–21.

"The jury is sufficiently capable of drawing its own inferences regarding intent, motive,
or state of mind from the evidence, and permitting expert testimony on this subject would be
merely substituting the expert's judgment for the jury's and would not be helpful to the jury."
*Siring v Or. State Bd. Higher Educ. ex rel. E. Or. Univ.*, 927 F. Supp. 2d 1069, 1077 (D. Or.
2013); *see also Johnson v. Wyeth LLC*, No. 10–C–2690, 2012 WL 1204081, at *3 (D. Ariz. Apr.
11, 2012) (excluding "opinions concerning defendants' motive, intent, knowledge, or other state
of mind").

Plaintiffs' expert opined that "[Defendant] did not inform [Plaintiffs] about [the transition
to SaaS] even though the changes in its licensing models substantively changed the economics of
the relationship between [Defendant] and [Plaintiffs]." Kursh Report ¶ 98. In rebuttal, Mr. Held
reviews examples of Plaintiffs using Defendant's transition to SaaS in marketing materials, Held
Report ¶¶ 90–95, before concluding "[i]t is plain to me that not only did [Plaintiffs] know
[Defendant] had successfully implemented ASP and [SaaS] for certain offerings, but that
[Plaintiffs] knew [Defendant] had substantial customers already using products on a [SaaS]
model[,]" *id.* ¶ 96.

Mr. Held's "plain to me" statement opines on Plaintiffs' knowledge and is excluded. In
*Siring*, the Court excluded opinions in an employment discrimination case that concluded "it
does appear quite plausible that the reason for the dismissal was the allegation of alcoholism"

and "[i]t appears very likely that these actions [by employer] were significant in promoting the negative decision . . . ." 927 F. Supp. 2d. at 1078. This strayed into impermissible opinions about the defendant's motive and the decisionmakers' state of mind. *Id.* Similarly, here, while Mr. Held may rebut Dr. Kursh's statement and dispute the degree to which Defendant did or did not inform Plaintiffs, Mr. Held may not opine on Plaintiffs' knowledge or state of mind.

B.    Audit Communications

Plaintiffs challenge Mr. Held's inclusion of excerpts of emails and other communications in his opinion about the audit. Pls.' Mot. 19 (citing Held Report ¶¶ 124–139). The Court identified four instances of excerpts in the cited paragraph range. Held Report ¶¶ 133, 134, 138, 139. It appears that Plaintiffs are focused on paragraphs 133 and 139. Pls.' Mot. 19; Pls.' Reply 12–13. Plaintiffs argue that "[n]one of the observations . . . are helpful to the trier of fact, who is welcome to review the correspondence and hear from the witnesses themselves, and make their own determination about the audit." Pls.' Mot. 19.

"The general test regarding the admissibility of expert testimony is whether the jury can receive 'appreciable help' from such testimony." *United States v. Gwaltney*, 790 F.2d 1378, 1381 (9th Cir. 1986) (quoting *United States v. Solomon*, 753 F.2d 1522, 1525 (9th Cir. 1985)). Courts "must be cautious not to overstate the scope of the average juror's common understanding and knowledge." *United States v. Finley*, 301 F.3d 1000, 1013 (9th Cir. 2002). The Ninth Circuit describes the inquiry as "whether the untrained layman would be qualified to determine intelligently and to the best degree, the particular issue without enlightenment from those having a specialized understanding of the subject matter involved." *Id.* (quoting *United States v. Shay*, 57 F.3d 126, 132 (1st Cir. 1995)).

//

Mr. Held's observations regarding the "maximum impact" email at paragraph 133 are helpful to the trier of fact, but the observations regarding the business development email at paragraph 139 are unhelpful. Held Report ¶¶ 133, 139. The observations of the email at paragraph 133 are helpful to a fact-finder because this communication involves discussion of royalty models, SaaS models, and fee percentages in the context of KPMG's plans for "maximum impact . . . ." Held Report ¶ 133. Because the Court above has permitted Mr. Held to discuss his views, based on his experience in the software licensing industry, of the communications between software developer Plaintiffs and KPMG, *see* Discussion, *supra* Section I, the Court accordingly permits Mr. Held's analysis of this email. The Court is convinced that, for the untrained layperson to understand the email to the best degree, Mr. Held's opinion is helpful. *See Finley*, 301 F.3d at 1013. In contrast, Mr. Held may not opine on the email communication included at paragraph 139. Held Report ¶ 139. This is a much simpler email for the jury to understand, and the content is not unique to the software industry nor replete with vocabulary. There is nothing about Mr. Held's expertise that makes him better than a layperson in understanding this email.

C.     Course of Dealing

Plaintiffs request "any testimony commenting on or interpreting the parties' communications or supposed course of dealing over the years . . . be excluded at trial." Pls.' Mot. 20. The Court understands this to be a forward-looking request; otherwise, it is premature. "[A]n objection to the 'narrative' nature of testimony is an objection [that] . . . is properly asserted at trial . . . . [I]t is not a proper objection to an *expert report*, that, itself, will not be placed into evidence . . . ." *Camenisch v. Umpqua Bank*, 763 F. Supp. 3d 871, 882 (N.D. Cal. 2025) (quoting

*Holley v. Gilead Scis., Inc.*, No. 18-CV-06972-JST, 2023 WL 2469632, at *6 (N.D. Cal. Feb. 27, 2023)).

## V.    Bolstering

In a footnote, Plaintiffs argue that two sections of Mr. Held's report stake out affirmative positions. Pls.' Mot. 20 n.8. Specifically, Plaintiffs argue that Mr. Held's sections on Plaintiffs' status as a sophisticated party, Held Report ¶¶ 34–39, and on Defendant's consistent payments to Plaintiffs, *id.* ¶¶ 40–46, constitute bolstering. Pls.' Mot. 20 n.8. Plaintiffs expanded on this argument in their Reply. Pls.' Reply 14–15. Defendant counters that both sections rebut Plaintiffs' experts' assertions that Plaintiffs were unaware of Defendant's transition to SaaS. Def.'s Resp. 26 (citing Kursh Report ¶¶ 27, 147–150; Tregillis Report ¶¶ 109, 117, 118).

At bottom is a dispute between the experts about which party bears the burden to notice a change in business practice. According to Plaintiffs' expert, "[t]he usual practice among resellers is to inform the licensor of any material changes in their licensing practices." Pls.' Reply 15 (quoting Kursh Report ¶ 147). In contrast, Defendant's expert states that "[w]here a royalty reporting system exists between a licensor and licensee, it is the industry norm for the licensor to diligently review the royalty reports to protect the licensor's interests and ensure the licensee performs . . . ." Held Report ¶ 44. Because Plaintiffs believe the burden rests with licensee to notify changes, it follows that Plaintiffs contend the only way to rebut is to articulate how Defendant licensee *did* notify. Because Defendant believes the burden rests with the licensor to perform due diligence, it follows that Plaintiffs' sophistication and receipt of royalty reporting is proper rebuttal as it shows how Plaintiffs had the capability and information to do so.

//

//

The Court declines to resolve the burden placement question in a *Daubert* proceeding and thus permits Mr. Held's opinions on the basis that they do not constitute bolstering if the fact-finder adopts his version of the industry custom.

## VI.    Evidentiary Objection

Defendant objects to charts included in Plaintiffs' exhibits, Wang Decl. Ex. E, at 2–4, ECF No. 122-5, on lack of authentication, lack of foundation, and unhelpfulness grounds.[3] Def.'s Obj. 1.

Defendant argues that these charts are the same summary charts on which the Court previously sustained Defendant's objection, finding "Wang's declaration . . . does not state that she prepared the chart, does not identify who prepared the chart or how it was prepared, and chart lacks basic information about the data it purports to show, such as [dates]." *Rocket Software, Inc. v. CollegeNET, Inc*., No. 3:22-cv-00327-AR, 2025 WL 1398975, at *5 (D. Or. Mar. 14, 2025), *report and recommendation adopted*, 2025 WL 1393856 (D. Or. May 14, 2025).[4] Defendant contends that Plaintiffs have "made no effort to remedy any of the deficiencies the Court previously identified." Def.'s Obj. 1.

Plaintiffs' counsel states in her Declaration that Exhibit E includes "true and correct copies of the [contracts] from which the chart data was compiled" and proceeds to list the relevant documents. Wang Decl. 2, ECF No. 121. Plaintiffs also argue in their Reply that "the information displayed in those charts derives from the end-user agreements and is also

---

[3] In their objection, Defendant cites "Exhibit E to the Oct. 17, 2025 Wang Decl. (ECF No. 121) at pp. 3-5." Def.'s Obj. 1. While the Wang Decl. is at ECF No. 121 and includes the introduction of the charts, Plaintiffs filed the exhibits, including Exhibit E, under ECF No. 122. Exhibit E is ECF No. 122-5 but does not have page numbers. Using the ECF-generated page numbers, the charts in issue are on pages 2–4.

[4] ECF Nos. 107, 112.

summarized in the table [Plaintiffs] provided in its Motion." Pls.' Reply 5 n.4 (citing Pls' Mot. at 10 n.4).

At oral argument, the Court sought clarification from the parties as to whether it was necessary to decide this evidentiary dispute to resolve the Motion to Exclude. Neither party answered in the affirmative. In oral argument, Defendant referenced the charts in the context of the reliability of Mr. Held's opinions about the changing economics of the relationship to support Defendant's contention that Plaintiffs' attorney-made charts do not resolve the revenue-proportion fact question. Because the Court (1) did not rely on the charts or any underlying factual evidence in reaching its conclusions on the reliability of Mr. Held's opinions with respect to billing/economics, and (2) did not hear at oral argument other reasons necessitating resolution of this evidentiary dispute to resolve the *Daubert* motions, the Court leaves this evidentiary dispute to pre-trial litigation.

## CONCLUSION

Plaintiffs' Motion to Exclude Robert F. Held [120] is GRANTED IN PART and DENIED IN PART.

IT IS SO ORDERED.

DATED this  19th  day of December, 2025.

*Amy M. Baggio*
_____
AMY M. BAGGIO
United States District Judge

23 – OPINION & ORDER