IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ROCKET SOFTWARE, INC., a Delaware corporation, and ROCKET SOFTWARE B.V., a Netherlands private limited company,

Plaintiffs

v.

COLLEGENET, INC., a Delaware corporation,

Defendant

Case No. 3:22-cv-00327-AB

FINDINGS OF FACT & CONCLUSIONS OF LAW

John Thomas Fetters
Theresa H. Wang
Bradford J. Axel
Joshua Harms
Shannon M. Jost
Valerie Walker
Stokes Lawrence, P.S.
1420 5th Avenue Suite 3000
Seattle, WA 98101

Attorneys for Plaintiffs

Alexis Paschedag Federico
Michael Roy Williams
Sheila Mojtehedi
Bienert Katzman Littrell Williams LLP
903 Calle Amanecer Suite 350
San Clemente, CA 92673-2021

Elliott J. Williams
Ethan Knight
Stoel Rives LLP
760 S.W. Ninth Ave. Suite 3000
Portland, OR 97205

Attorneys for Defendant

**BAGGIO, District Judge:**

This dispute arises out of a twenty-six-year software licensing agreement between Uniface B.V., the predecessor-in-interest to Plaintiffs Rocket Software, Inc. and Rocket Software, B.V., and Defendant CollegeNET, Inc. Revised Final Pretrial Order ("Revised PTO") 1, ECF No. 136. Plaintiffs brought suit alleging breach of contract and copyright infringement. Compl. ¶¶ 31–43, ECF No. 1. Defendant asserted affirmative defenses of waiver and equitable estoppel, among others. Answer 8, 13, ECF No. 17. The Court granted summary judgment for Defendant on Plaintiffs' copyright claim. Op. & Order, ECF No. 112. The Court continued to exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over the breach of contract claim; Plaintiffs' breach of contract claim and Defendant's waiver affirmative defense proceeded to a jury trial. Prior to trial, the Court adopted a briefing procedure for Defendant's equitable estoppel affirmative defense following the close of evidence. Order, ECF No. 171.

The Court conducted a five-day jury trial on Plaintiffs' breach of contract claim and Defendant's waiver affirmative defense from June 1 to June 5, 2026. *See* Tr. of Proceedings, ECF Nos. 200–204. Following the close of evidence, Defendant submitted its brief on its equitable estoppel defense. Def.'s Br. Equitable Estoppel, ECF No. 191. The jury returned a

verdict for Plaintiffs on the breach of contract claim and rejected Defendant's waiver affirmative defense. Verdict Form, ECF No. 194.[1] Following the jury's verdict, the Court supplemented its order regarding the procedure for trying Defendant's equitable estoppel affirmative defense by ordering the parties to file proposed findings of fact and conclusions of law by June 26, 2026. ECF No. 205. The parties filed accordingly. *See* Def.'s Proposed Findings of Fact & Conclusions of Law ("Def.'s FF&CL"), ECF No. 206-2; Pls.' Proposed Findings of Fact & Conclusions of Law ("Pls.' FF&CL"),[2] ECF No. 207.

Defendant asks the Court to equitably estop Plaintiffs from recovering under the licensing agreement. Specifically, Defendant seeks a finding that (1) Plaintiffs were apprised of the facts; (2) Plaintiffs intended that its conduct be acted upon, or that Defendant had a right to believe Plaintiffs so intended; (3) Defendant was ignorant of the true state of facts; and (4) Defendant relied upon Plaintiff's conduct to its injury. *See* Def.'s FF&CL ¶ 148. Plaintiffs disagree at every turn. *See generally* Pls.' FF&CL. Following the filing of the respective proposed FF&CLs, Defendant moved to strike what Defendant argues are new fraud allegations set forth by Plaintiffs in their FF&CL. Def.'s Mot. Strike, ECF No. 208. Defendant's motion was fully briefed on August 12, 2026. *See* Def.'s Reply, ECF No. 211.

The Court's Findings of Fact and Conclusions of Law are as follows. *See* Fed. R. Civ. P. 52(a).

---

[1] The jury verdict pertained to underpayment of fees after September 4, 2017, due to the statute of limitations.

[2] Because Plaintiffs' FF&CL paragraph number restarts at the Conclusions of Law, the Court will cite Plaintiffs' submission as FF *or* CL ¶ #.

## FINDINGS OF FACT

### I. The Contract and Amendments

1. On June 13, 1994, Plaintiffs and Defendant entered into a Value Added Reseller ("VAR") Agreement. Ex. 52 at 11–19. The VAR Agreement allowed Defendant to incorporate Plaintiffs' software in Defendant's own software that Defendant would, in turn, sell to its customers. Ex. 52 at 12–13. In industry terms, Defendant was the Value Added Reseller, or VAR. Ex. 52 at 11.

2. Also on June 13, 1994, contemporaneous with the VAR Agreement and appended as an exhibit to the VAR Agreement, the parties entered into a License Agreement. Ex. 52 at 26–37.

3. On June 30, 1994, the parties executed a First Amendment to the VAR Agreement, Ex. 52 at 7–10, as well as a First Amendment to the License Agreement, Ex. 52 at 21–25.

4. The First Amendment to the License Agreement provided that "construction and performance of this Agreement shall be governed by the laws of the State of California" and that "where [Defendant] is the defendant venue shall be in a court located in Multnomah County, Oregon." Ex. 52 at 24.

5. Under the VAR Agreement, Defendant agreed to pay Plaintiffs as follows:

> 3.1 Royalties. In consideration of the rights granted herein, VAR agrees to pay Uniface royalties in the percentage(s) specified in Exhibit C for each copy of the Runtime Software as incorporated in the VAR Application Software licensed by VAR and delivered to an end user, whether or not VAR has received from such end user the full license fee owed by the end user to VAR.
>
> 3.2 Support Fees. In connection with the sublicense by VAR of the Runtime Software, VAR agrees to pay to Uniface the annual support fees set forth in Exhibit C hereto for each End User on a VAR maintenance or support program for the VAR Application Software.

Ex. 52 at 15.

6. In turn, Exhibit C as referenced in the VAR Agreement provided the following percentage schedule.

| Royalty Amount | Royalty Rate | Annual Support Fee |
|---|---|---|
| < 500,000 | 8% | 1% |
| $500,000–$1,000,000 | 6% | 1% |
| $1,000,000–$2,000,000 | 4% | 1% |
| $2,000,000+ | 2% | 1/2 of 1% |

Ex. 52 at 41.

7. The First Amendment to the VAR Agreement provided that the Agreement was effective for five years and then fifteen automatic one-year renewals, or through 2013, so long as Defendant met certain minimum royalty payments. Ex. 52 at 9.

8. In late 2013, the parties executed an amendment to extend the VAR Agreement from 2014 through 2017. Ex. 52 at 5–6. The 2014 Amendment modified the payment language and rates as follows:

> Royalty / Maintenance Rate for Application Purchased by End User
>
> Royalty 6% of Application Sale Price
> Annual Maintenance 1.5% of Application Sale Price

Ex. 52 at 6. The Court will refer to this as the 2014 Amendment.

9. In early 2018, the parties executed an amendment to extend the VAR Agreement from 2018 through 2020. Ex. 52 at 1–4. The 2018 Amendment modified the payment language and rates as follows:

> Royalty / Maintenance Rate for Application Purchased by End User
>
> Royalty 9% of Application Sale Price
> Annual Maintenance 2% of Applicable Sale Price*

> *for clarification: VAR Application Sales Price & Applicable Sales Price mean the invoice price charged to VAR's customer

Ex. 52 at 2. The Amendment also added that "For clarity, Royalty Fees are due and owed to [Plaintiffs] <u>for each sale</u> of the VAR application to an End User, regardless of whether such transaction involves new and/or additional licenses, and regardless if the VAR End User pays [Defendant]." Ex. 52 at 2. The Court will refer to this as the 2018 Amendment.

10. The parties did not enter into any further amendments to the VAR Agreement, and it therefore expired on December 31, 2020. *See* Ex. 52 at 2.

## II. Defendant's Transition to SaaS

11. In the 1990s, the software industry used an "on premises" or installed model in which "software arrived [to the customer] on a DVD or a CD [or] a floppy disk[.]" Tr. (Day 1) 170:13–20.[3] This model typically used a "perpetual license" in which the customer "paid a right to use" and the customer "paid it one time." Tr. (Day 1) 170:24-171:2. In contrast, the software as a service ("SaaS") model provides software over the internet. Tr. (Day 1) 173:8–14. SaaS is a subscription-based model in which the customer must continue making payments to retain the right to use the software. Tr. (Day 1) 208:5–15; Tr. (Day 2) 257:15–258:8.

12. Defendant developed and sold three software products incorporating Plaintiffs' software: R25, X25, and 25Live. Tr. (Day 3) 450:10–15. R25 was not a Saas product; both X25 and 25Live were SaaS products. Tr. (Day 3) 450:25–451:4.

13. Over the course of the twenty-six-year contractual relationship, Defendant transitioned from an "on premises" model to a SaaS model. Tr. (Day 3) 455:21–25 ("[W]ell over

---

[3] Citations to live testimony at trial will be cited as Tr. (Day #).

80 percent of [Defendant's] scheduling customers were using R25 in 2010, and then well over 80 percent were using 25Live in 2018.").

14. Plaintiffs admit that by the end of 2015 it knew Defendant was using a SaaS model to deploy software. Tr. (Day 2) 285:15–18; Pls.' FF ¶ 41; *see also* Ex. 592 at 1–2 (Plaintiffs' 2008 marketing material case study showcasing Defendant "[choosing] SaaS as a delivery model for the new application, now called 25Live"); Ex. 538 at 3 (Plaintiffs' 2013 marketing material case study showcasing Defendant's SaaS products and describing Defendant as using "a flat site license, which includes a basic fee for implementation and then quarterly service fees").

15. Plaintiffs had a contract template for VARs selling their software on a SaaS model. Ex. 53. However, there is no evidence that Plaintiffs disclosed or provided this template to Defendant.

**III. Performance Under the Contract**

16. The VAR Agreement required Defendant to submit a royalty report to Plaintiffs no later than thirty days after each calendar quarter. Ex. 52 at 15.

17. Defendant submitted quarterly royalty reports to Plaintiffs throughout their twenty-six-year relationship. *See* Exs. 32–51, 509–512, 514, 519, 552, 563, 605, 616, 623, 627 644–648, 651. The quarterly reports showed, among other information, the fees Defendant received from its customers for that quarter, the percentages Defendant applied to those fees, and the total amount payable to Plaintiffs based on the reported fees and applied percentages. *Id.*

18. For the entirety of the parties' relationship, Defendant calculated and reported its royalties in generally the same manner. Defendant applied the higher contractual percentage to the "initial fee" or "basic fee" it charged a customer at the outset of the relationship or upon

expanding the relationship by adding a new product or campus. In turn, Defendant applied the lower contractual percentage to the ongoing "annual fee" or "quarterly service fee" it charged the customer thereafter. *See* Exs. 32–51, 509–512, 514, 519, 552, 563, 605, 616, 623, 627, 644–648, 651; Tr. (Day 3) 518:14-520:22; Kostukovsky Tr. at 41:02-41:19, 41-24-42:06.[4]

19. In the first royalty report in evidence, for Q4 1997, Defendant reported for its R25 product "Annual Fees" subject to a rate of 1 percent and "Basic Fees" subject to a rate of 8 percent. Ex. 509 at 1–2. After the 2014 Amendment—which changed the name of the of the lower percentage bucket from "Support Fees" to "Annual Maintenance"—went into effect, Defendant continued sending its royalty reports in the exact same format. *Compare* Ex. 32 (royalty report for Q4 2013 listing payments for annual fees and service fees subject to lower percentage on pages 1–7 and basic fees subject to higher percentage on page 7), *with* Ex. 33 (royalty report for Q3 2014 listing same). And in the royalty report for the last quarter of 2020, Defendant reported "Basic Fees" subject to a rate of nine percent, Ex. 51 at 14, and "Annual Fees" and "Quarterly Fees" at a rate of two percent, Ex. 51 at 1–14.

20. Defendant's contracts with its customers reflected the annual/quarterly service fee and initial/basic fee terminology. Pls.' FF ¶¶ 86–91.

## IV. Relevant Personnel

21. Ms. Isabella Kostukovsky was Plaintiffs' account manager in charge of Defendant's account. Ex. 544; Kostukovsky Tr. at 18:06-18:14.

[4] The parties offered video deposition testimony at trial. The Court Reporter did not transcribe the video deposition testimony offered at trial; instead, the parties filed the transcripts of those portions of testimony. Joint Notice of Filing of Dep. Designation Reports, ECF No. 189. Deposition designation testimony will be cited using the witness' name.

22. Mr. Deniz Yugnuk is Plaintiffs' Vice President of Sales and Business Development. Tr. (Day 2) 237:21–22. Mr. Yugnuk countersigned acceptance of Defendant's royalty reports. Kostukovsky Tr. at 59:06-16.

23. Ms. Kristi Yamasaki and Ms. Jennifer Loren are employees in Defendant's accounting department responsible for Defendant's reporting to Plaintiffs. *See* Ex. 546; Tr. (Day 3) 489:3-16.

24. Mr. Ed Trachtenbarg was Defendant's Chief Financial Officer who oversaw accounting and negotiated the 2014 and 2018 Amendments with Plaintiffs. Tr. (Day 3) 511:23–25; Tr. (Day 3) 513:19–514:4.

**V. The 2014 Amendment Negotiations**

25. The parties negotiated the 2014 Amendment over email between June and August 2013. *See* Ex. 539. The Amendment was signed in October 2013. Ex. 52 at 6. The parties' negotiations during this time period did not address any topics relevant to the instant dispute; the discussions focused on the length of extension and percentage values. *See* Ex. 539.

26. Plaintiffs' negotiator had received a copy of Plaintiffs' 2013 Customer Case Study showcasing Defendant's SaaS products. Ex. 537; Tr. (Day 2) 278:24-279:15. Plaintiffs' negotiator did not raise any billing method issues in email negotiations. *See* Ex. 539.

**VI. 2016 and 2017 Email Discussions**

27. In February 2016, Ms. Loren sent Defendant's royalty report for the fourth quarter of 2015 to Plaintiffs. Ex. 546 at 9. Ms. Kostukovsky responded: "Possibly I am confused, I don't see maintenance fee numbers they have to pay according to VAR agreement." Ex. 546 at 8. Ms. Loren responded: "If I'm understanding your question – you're looking for the 'maintenance' fee that we charge are listed as either Annual Fee's[], or they are Service Fees, billed quarterly . . . .

The bottom of the report will detail the Initial Licensing Fee – or 'Basic Fee's' . . . ." Ex. 546 at 8.

28. In May 2016, Ms. Kostukovsky returned to this chain to ask, with respect to the report for Q1 2016, "Is maintenance reported for the new sales?" Ex. 546 at 5. Ms. Yamasaki responded, "I think the language is just a little bit different but we have calculated the fees correctly. 6% is applied to the New Sales which we refer to as 'Basic Fees[.]' 1.5% is applied to the Annual Maintenance which we refer to as 'Annual Fees' and 'Service Fees.'" Ex. 546 at 5.

29. Ms. Kostukovsky responded, "I see the 6% for new sales, but I don't see additional 1.5% in maintenance for new sales." Ex. 546 at 4. Ms. Yamasaki responded, "If you reference the summary on the first page, there is a section showing the Annual/Service fees calculated at a 1.5% rate and below that are the Basic Fees calculated at a 6% rate. My understanding is the 1.5%, is not billed on top of the 6% for the Basic Fees, they apply to the ongoing Annual and Service fees." Ex. 546 at 4.

30. Ms. Kostukovsky responded, "The 1st year maintenance should always be included for new sales." Ex. 546 at 4. Ms. Yamasaki responded, "I was told that is not correct. 1.5% only applies to the Annual/Service fees which you refer to as the maintenance fee. Historically we have paid 6% on Basic Fees and 1.5% on Annual/Service fees." Ex. 546 at 3.

31. After Ms. Kostukovsky pointed Ms. Yamasaki to the contract language, Ms. Yamasaki asked, "are you stating that we should be paying 7.5% on Basic Fees? And if so, what rate should be paid on Annual/Service Fees?" Ex. 546 at 3. Ms. Kostukovsky responded, "The royalty rate is 6% from the sale price. Maintenance fee for the 1st 12 month[s] is 1.5% from the sale price." Ex. 546 at 3. Ms. Yamasaki responded, "This is exactly what we have calculated.

The 1.5% is calculated on the Maintenance Fee (Licensing Service Fee) that is billed either annually or quarterly. 6% is calculated on the Initial Licensing Fee (or Basic Fee).” Ex. 546 at 2.

32. Ms. Kostukovsky responded, “When you sell your software do you collect the maintenance upfront for the 1st year?” Ex. 546 at 2. Ms. Yamasaki responded, “No. When a sale is made there is an Initial License Fee (Basic Fee) billed. Then on an annual or quarterly basis the customer is billed for licensing service fees in arrears.” Ex. 546 at 2.

33. Ms. Kostukovsky responded, “Our license model is when we sell . . . licenses for VARs, we collect 1st year maintenance upfront. It’s always been this way. In your case, I understand you collect for past due maintenance, correct?” Ex. 546 at 1. Ms. Yamasaki responded, “In our case it’s not a maintenance fee. They are licensing fees and there is an Initial License Fee [that is] collected upfront at the time of sale, that is the Basic Fee and we are paying a 6% royalty on that. Then the subsequent licensing fees are billing either annually or quarterly and we are paying 1.5% royalties on those fees.” Ex. 546 at 1. Ms. Kostukovsky responded, “I think the only difference [is that] we collect upfront and you in arrears.” Ex. 546 at 1.

34. In August 2016, in a new chain about the royalty report for Q2 2016, Ms. Kostukovsky asked Ms. Yamasaki, “Can you please indicate on the report what is the amount of maintenance for the new transactions?” Ex. 553 at 2. Ms. Yamasaki responded, “I don't understand what you're asking for? Can you give me an example based on what we sent you last quarter? Maintenance fee isn’t a term we use, so I don't know how it applies to Quarterly Service Fees, Annual Service Fees and Setup Fees that are included on this report.” Ex. 553 at 2. Ms. Kostukovsky responded, “we expect to receive the royalty fee for new transactions and annual maintenance for a year.” Ex. 553 at 1. Ms. Yamasaki responded, “This report is the same that we agreed to last quarter and we are paying royalties for the same types of service fees, annual and

setup fees. I can’t comment on what you are considering ‘maintenance fees’ since I don't have an understanding of what those are.” Ex. 553 at 1.

35. Through this point in the relationship, Defendant had consistently sent their quarterly reports in the same format—a spreadsheet that would categorize fees by quarterly/annual fees and basic fees. *See* Exs. 645–648 (Defendant’s four quarterly reports for 2015). This format did not characterize fees as “maintenance” or “royalty” but rather annual/quarterly service fees and basic fees.

36. Later in August 2016, Ms. Kostukovsky sent Defendant a template for Defendant to use for royalty reporting to replace the method with which Defendant had been reporting. Ex. 557 at 2. Defendant complied by copying their report into this new template, but Defendant kept the “Annual Fee,” “Quarterly Service Fees” and “Basic Fees” headers and categories. Ex. 557 at 4–19. Per the template, the final column was titled “Royalties.” The royalty report was discussed by Plaintiffs internally, and Plaintiffs’ accounting analyst wrote that Defendant’s new report “refers to existing maintenance of their [customers]. Royalties is only for new licenses. As you see below, now they refer . . . to annual fees which is confusing, is it royalties or existing maintenance?” Ex. 565 at 2–3. Ms. Kostukovsky forwarded these comments to Defendant. Ms. Yamasaki, in an internal email to Mr. Trachtenbarg, stated “I believe that they have changed the labeling on the report from ‘Annual/Service Fee Royalty’ to ‘Maintenance’, do you see any issue with that?” Ex. 565 at 1. Mr. Trachtenbarg replied, “Those changes are fine. I guess they always want us to fit into their mold rather than adapting to our language and way of doing things. As long as it doesn’t change the numbers, I don’t care about the wording they want.” Ex. 565 at 1.

## VII. The 2018 Amendment Negotiations

37. In the negotiations for the 2018 Amendment, the parties negotiated on three fronts: percentage rate, maintenance timing, and applicable versus application sale price. Ex. 17.

38. First, on the percentage rate, Ms. Kostukovsky sought to increase the percentage rates. Ex. 17 at 10 (initially proposing increase of royalty fee from 6% to 7.5%).

39. Second, on the maintenance timing, Ms. Kostukovsky sought to require that "the maintenance must be paid during the royalty reporting for the quarter." Ex. 17 at 10; *id.* at 9 ("[Plaintiffs'] Finance requests the maintenance payment for the customers on the royalty report paid at the time of reporting. So basically we need the upfront payment.").

40. Third, on the applicable versus application sale price, Ms. Kostukovsky sought to have the annual maintenance applied to the application sale price rather than the applicable sale price. Ex. 17 at 7 ("[T]he maintenance for VARs is always the percentage of the application sale price. I remember you had a concern it will be a bit high if we are to follow this model. Can we possibly agree on 1.5% from the application sale price?"); Ex. 17 at 6 ("It seems like it was an oversight on the site of Compuware/Uniface as the VAR agreement stated the percentage of the Application Sale price from the time of the original one."); Ex. 13 at 1 (Ms. Kostukovsky writing to colleagues internally that "[Defendant] would like to keep 'Applicable' in the maintenance section").

41. Mr. Trachtenbarg was open to negotiating on the percentage rate increase but protested any changes to maintenance timing or applicable sale price. Ex. 17 at 7 ("If we agree to 8% on the initial license fee and 2% on the service fees, staying with the same billing model we have always used for 23 years, do we have final agreement on the amendment?"); Ex. 17 at 8 ("Let's agree on the new royalty rates and continue the payment model as before (with increased

rates) so that both parties are satisfied with the new arrangement."); Ex. 17 at 8 ("We are at a loss to understand why Uniface now suggests changing our business model after all these years and would expect us to pay royalties on revenue we don't have and haven't billed our customer for.").

42. Ultimately, Plaintiffs prevailed in obtaining a higher royalty percentage rate, and Defendant prevailed in the maintenance timing and application sale price remaining unchanged. Ex. 17 at 3 (agreeing to "royalty at 9% and maintenance with the model we have in place now at 2%"). Both Ms. Kostukovsky and Mr. Yugnuk understood this as a bargained-for agreement in which Defendant would pay a higher royalty percentage for the continuation of the payment regime. Ex. 14 at 1 (Ms. Kostukovsky writing to Ms. Yugnuk that she "convinced [Defendant] to increase [royalty] to 9%, it's a 50% increase. We will keep the maintenance as they pay now at 2%. We should change the term for maintenance to 'applicable' not to have future confusion. Nothing is changed on the maintenance side.").

43. Mr. Trachtenbarg memorialized the understanding presented by Ms. Kostukovsky in her email to Mr. Yugnuk in two ways.

44. First, on a draft of the contract sent to Plaintiffs, Mr. Trachtenbarg added a handwritten asterisk next to the amount against which the maintenance percentage was applied: "for clarification: VAR Applicable Sales Price means the invoice price charged to VAR's customer." Ex. 17 at 13 (handwritten edit). This handwritten edit was incorporated into the signed contract with slightly different language: "for clarification: VAR Application Sales Price and Applicable Sales Price mean the invoice price charged to VAR's customer[.]" Ex. 52 at 2. The handwritten use of "means" indicates Mr. Trachtenbarg intended to only reference a singular noun—the applicable sales price. In other words, Mr. Trachtenbarg's handwritten version seeks

to distinguish the amount against which the royalty percentage would be applied—the price of the application—from the amount against which the maintenance percentage would be applied—the amount billed on the invoice. Indeed, Mr. Trachtenbarg testified that he added the asterisk "because we wanted to be absolutely clear that we were applying the 2 percent to the amount we charged our customer for the service fees." Tr. (Day 3) 547:13–15. For her part, Ms. Kostukovsky understood similarly when she wrote her colleagues that "[w]e should change the term for maintenance to 'applicable' not to have future confusion." Ex. 14 at 1. Mr. Kostukosky did not write about an analogous change for the royalty percentage.

45. Second, when Mr. Trachtenbarg sent the signed 2018 Amendment to Ms. Kostukovsky, he stated in his cover email, in bold font, "[a]s we discussed and agreed, we will continue to report our sales in the same manner as in the past and will pay our quarterly royalties due after the end of each calendar quarter." Ex. 21 at 1.

46. During these negotiations, Mr. Trachtenbarg characterized Defendant's billing model as follows: "We bill an upfront licensing fee and then start billing quarterly for service fees (likely what you call 'maintenance')." Ex. 17 at 8.

47. At trial, when Mr. Trachtenbarg was asked about the email exchange in Exhibit 17, he testified:

> Q. So that's what you mean when you say "staying with the same billing model," you're referring to that description of the billing model that you just gave; right?
>
> A. Yes, a fee on the initial license fee, a higher fee, and a lower fee on the quarterly service fees.
>
> Q. On the maintenance?
>
> A. Yes.
>
> Q. That's the word you used?

A. Well, we use quarterly service fees. We only use maintenance because they asked us to.

Q. Well, hang on a second. Let's dig into that. I thought we had established that it's the licensing agreement, the VAR agreement, that sets the ground rules of CollegeNET's payment obligations to Uniface. Would you agree with that?

A. From a strictly legal sense, yes.

Q. And that document that sets the ground rules uses the word "royalty" with the higher percent; correct?

A. Yes.

Q. And it uses the words "annual maintenance" with the lower percent; correct?

A. Yes.

Tr. (Day 3) 573:4–24.

**VIII. Audit**

48. The VAR Agreement granted Plaintiffs "the right to have [Defendant's] books and records of sales audited by an independent auditor of [Plaintiffs'] choice not more than once during each of [Defendant's] fiscal years." Ex. 52 at 15.

49. In 2018, Plaintiffs established a formal compliance auditing program and hired Els Oirbans as their Compliance Auditor. Tr. (Day 3) 366:14–367:11.

50. In November 2019, Ms. Oirbans was forwarded Defendant's royalty report for the third quarter of 2019. Ms. Oirbans sent an internal email to Mr. Yugnuk, among others, stating, "I can't imagine that the application price, for which they are calculating 9% royalty, is correct." Ex. 599 at 1. Ms. Oirbans explained that the relative amount of reported royalty ($227,000) seemed very low compared to the amount of reported maintenance (over $2.5 million) in the Q3 2019 royalty report. Tr. (Day 3) 373:6–374:9; Ex. 605.

51. Shortly thereafter, Ms. Oirbans found the 2008 customer case study in which Plaintiffs' marketing materials showcased Defendant's SaaS products. Ms. Oirbans emailed the study to Mr. Yugnuk, among others, noting: "they use SAAS and are charging only 1x; thereafter, minimal [maintenance]." Ex. 592 (original); Ex. 593 (English translation); *see also* Tr. (Day 3) 377:18–378:12.

52. Ms. Oirbans inquired of Defendant. Mr. Trachtenbarg responded:

> On our schedules you will see a category of invoices called "Annual Maintenance Fees/Service Fees listed first and those are the "maintenance fees" we charge our customers for use of our products and support from us. We now pay Uniface 2% of the invoiced amount based on when we have invoiced our customers. This falls under the category of "Annual Maintenance" below. In the past we mostly billed these annually. In the last three years (or so) we have moved all of our customers to quarterly billings for the Service Fees so you get paid quarterly on these invoices also.
>
> The second category on our schedules and reports to Uniface is "Basic Fees". This is the initial fee we charge to customers for licensing our products. Those are billed at the time the initial product license is signed and invoiced. This falls under the category of "Royalty Fee" below and we now pay Uniface 9% of each of these initial invoices.

Ex. 24; *see also* Tr. (Day 3) 380:19–381:14.

53. After receiving Mr. Trachtenbarg's email, Plaintiffs initiated an audit of Defendant. Tr. (Day 3) 382:14–17.

## IX. Industry Customs and Terms

54. If software licensors (here, Plaintiffs) learn that a software licensee (here, Defendant) is paying incorrectly, the industry custom expects the licensors to inform the licensee of its position. Tr. (Day 1) 205:21–206:2.

55. The term "maintenance" in the software licensing industry refers to updates, upgrades, telephone support, customer support, patches, and similar. Tr. (Day 1) 165:9–166:2; Tr. (Day 2) 240:18–241:14; Tr. (Day 3) 479:19–23; Trachtenbarg Tr. at 56:20–24, 63:24–64:08.

56. The term "royalty" in the software licensing business means a payment made by a software licensee to a software licensor in exchange for the "right to use" the software. Tr. (Day 1) 159:6–23, 161:21–165:8, 166:16–168:1.

## CONCLUSIONS OF LAW

A. At the outset, the Court observes that under California law, "waiver and estoppel are distinct doctrines." *Hoopes v. Dolan*, 168 Cal. App. 4th 146, 161 (2008) (quoting *DRG/Beverly Hills Ltd. v. Chopstix Dim Sum Cafe & Takeout III, Ltd.*, 30 Cal. App. 4th 54 (1994)). In *Hoopes*, after the jury found the defendant liable for breach of contract, the court entered judgment in favor of the defendant on equitable estoppel grounds. *Id.* at 154. There, as here, the jury "was instructed exclusively on waiver, not estoppel." *Id.* at 163; *cf.* Court's Instructions to the Jury No. 17, ECF No. 197. On appeal, the *Hoopes* court affirmed that "the jury's implicit finding that [the plaintiff] did not waive his exclusive parking rights . . . did not resolve the question whether [the plaintiff] should be estopped from claiming exclusive parking." *Id.* at 162. The doctrines are distinct because, among other reasons, waiver does not require inducement or "a voluntary relinquishment of a known right. " *Id.* at 162–63.

B. Estoppel is an equitable defense under California law properly resolved by the court, not the jury. *Hoopes*, 168 Cal. App. 4th at 161 ("[E]quitable estoppel is an equitable issue for court resolution."); *Granite State Ins. Co. v. Smart Modular Techs., Inc.*, 76 F.3d 1023, 1027 (9th Cir. 1996) (holding an "equitable estoppel defense presents issues to be resolved by the court").

C. There is conflicting California authority about whether equitable estoppel must be established by a preponderance of the evidence or by clear and convincing evidence.

D. A 2003 California appellate court found "[t]he party seeking to establish an estoppel must show by clear and convincing evidence [the elements of estoppel]." *In re Marriage of Brinkman*, 111 Cal. App. 4th 1281, 1289 (2003). For that proposition, *Brinkman* cites *In re Marriage of Fell*, 55 Cal. App. 4th 1058, 1065 (1997). *Fell* is a waiver case that does not discuss estoppel. 55 Cal App. at 1065. Thus, *Brinkman* is the genesis of this line. At least one federal bankruptcy case cites *Brinkman* for the clear and convincing standard. *In re S. Bay Expressway, L.P.*, Brankr. Nos. 10–04516–A11, 10–04518 2010, 2010 WL 4688213, at *5 (Bankr. S.D. Cal. Nov. 10, 2010). The California Jurisprudence treatise also relies solely on *Brinkman* in stating "[t]he party asserting estoppel must prove all its elements by clear and convincing evidence." 30 Cal. Jur. 3d Estoppel and Waiver § 16.

E. In contrast, a series of California appellate decisions involving school district defendants articulate a preponderance standard for estoppel. *Christopher P. v. Mojave Unified Sch. Dist.*, 19 Cal. App. 4th 165, 170 (1993) ("Estoppel . . . arises when the plaintiff establishes by a preponderance of the evidence . . . ."); *K.J. v. Arcadia Unified School Dist.*, 172 Cal. App. 4th 1229, 1240 (2009) (citing *Christopher*); *Santos v. Los Angeles Unified Sch. Dist.*, 17 Cal. App. 5th 1065, 1076 (2017) (citing *Christopher*); *Garcia v. Fresno Unified Sch. Dist.*, No. 1:25-cv-01096 JLT EGC, 2026 WL 1707671, at * 3 (E.D. Cal. June 12, 2026) (citing *Santos*). The Court is not aware of a reason for treating cases involving school district defendants differently for the estoppel burden of proof.

F. Defendant cites a 1994 federal district court applying California law outside the context of school district litigation that found equitable estoppel must be "establish[ed] by a preponderance of the evidence[.]" *Granite State Ins. Co. v. Smart Modular Techs., Inc.*, No. C-90-3136 BAC, 1994 WL 173858, at *4 (N.D. Cal. Apr. 28, 1994), *aff'd on other grounds*, 76

F.3d 1023 (9th Cir. 1996). *Granite* cites *Lentz v. McMahon,* 49 Cal. 3d 393, 399 (1989) for this proposition; however, *Lentz* only articulates the elements of estoppel and does not articulate a burden of proof. Thus, *Granite* does not provide support for the application of a preponderance standard under California law. Separately, two federal bankruptcy opinions issued by the same judge also apply the preponderance standard to a California state law estoppel analysis but do not cite any authority. *See In re Aubry*, 558 B.R. 333, 345 (Bankr. C.D. Cal. 2016); *In re Gonzalez*, 620 B.R. 296, 313 (Bankr. C.D. Cal. 2019).[5]

G. Nevertheless, given the weight of the California appellate decisions cited above, the Court concludes that the preponderance of the evidence standard applies.

H. The parties agree on the elements for equitable estoppel. *Compare* Def.'s FF&CL ¶ 148, *with* Pls.' CL ¶ 2. Those elements are: "(1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel has a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury." *City of Goleta v. Superior Court*, 40 Cal. 4th 270, 279 (2006) (quoting *City of Long Beach v. Mansell*, 3 Cal. 3d 462, 489 (1970)). The parties also agree that the party asserting estoppel—here, Defendant—has the burden of proving these elements. *See Santa Clara Valley Water Dist. v. Century Indem. Co.*, 89 Cal. App. 5th 1016, 1052 (2023). Each element must be satisfied:

---

[5] The Court also notes that an unpublished, and therefore uncitable, California appellate case recognized but did not resolve the conflict as to the proper standard of proof for an equitable estoppel defense. *In re Marriage of Goodman*, No. H039788, 2014 WL 3708156, at *9 (Cal. Ct. App., July 28, 2014). The *Goodman* court compared *K.J.*'s preponderance standard with *Brinkman*'s clear and convincing standard but did not resolve the issue since the court found the result was the same under either burden.

"[W]here even one of the requisite elements for estoppel is missing, it does not apply." *Feduniak v. Cal. Coastal Comm'n*, 148 Cal. App. 4th 1346, 1360 (2007).

## I. Estoppel Element One: Knowledge

I. "[W]here the conduct creating the estoppel consists of silence or acquiescence[,]" the party to be estopped must be shown to have actual knowledge. *Feduniak*, 148 Cal. App. 4th at 1361 (quoting *Mansell*, 3 Cal. 3d at 491 n.28). "However, actual knowledge is not invariably necessary for estoppel." *Id.* The actual knowledge requirement "does not apply where the party, although ignorant or mistaken as to the real facts, *was in such a position that he ought to have known them, so that knowledge will be imputed to him.* In such a case, ignorance or mistake will not prevent an estoppel." *Id.* (quoting *Mansell*, 3 Cal. 3d at 491 n.28).

J. The Court identifies three grounds for a finding of knowledge: the 2016 email exchange between Ms. Kostukovsky and Ms. Yamasaki; Defendant's SaaS transition; and the 2018 amendment negotiations between Ms. Kostukovsky and Mr. Trachtenbarg.

K. **First**, at three points during the 2016 email exchange, Ms. Yamasaki told Ms. Kostukovsky that the quarterly or annual service fees were licensing fees. Ex. 546 at 1 ("In our case it's not a maintenance fee. They are licensing fees and there is an Initial License Fee [that is] collected upfront at the time of sale, that is the Basic Fee and we are paying a 6% royalty on that. Then the subsequent licensing fees are billing either annually or quarterly and we are paying 1.5% royalties on those fees."); Ex. 546 at 2 ("[O]n an annual or quarterly basis the customer is billed for licensing service fees in arrears."); Ex. 546 at 2 ("The 1.5% is calculated on the Maintenance Fee (Licensing Service Fee) that is billed either annually or quarterly."). Plaintiffs' accounting analyst also contemporaneously understood this. Ex 565 at 2-3 (identifying the problem as "[r]oyalties is only for new licenses.").

L. Plaintiffs responded to each of Ms. Yamasaki's emails. *See generally* Ex. 546. Any failure by Plaintiffs to understand the emails for their plain language does not preclude a finding of knowledge. Plaintiffs were in such a position that they ought to have known. [6]

M. Plaintiffs also point to Ms. Kostukovsky's testimony that during these email exchanges she was under the assumption that Defendant sold its software on a perpetual license model. Kostukovsky Tr. at 45:13–45:18. But Plaintiffs' reliance on this testimony cannot be squared with Plaintiffs' admission that by 2015, they knew Defendant was on a SaaS model. Tr. (Day 2) 285:15–18; *see also* Pls.' FF ¶ 41.

N. In sum, Plaintiffs were in such a position that [they] ought to have known based on Ms. Yamasaki's emails that Defendant's quarterly or annual service fees were licensing fees.

O. **Second**, Plaintiffs advertised Defendant's SaaS model in 2013 and described Defendant's licensing model as "a flat site license, which includes a basic fee for implementation and then quarterly service fees." Ex. 538 at 3. Plaintiffs admit that by 2015 they knew Defendant was on a SaaS model. Plaintiffs also knew SaaS was a subscription-based model. Tr. (Day 1) 208:5–18; Tr. (Day 2) 257:15–258:8; Tr. (Day 3) 390:11–16. In a subscription-based model, each payment is for the right to use. A payment for the right to use is a licensing fee. Tr. (Day 1) 159:6–23; 161:21–165:8; 166:16–168:1. Thus, Plaintiffs knew, as Ms. Yamasaki put it, that on an "annual or quarterly basis [Defendant's] customer is billed for licensing service fees." Ex. 546 at 2.

[6] Plaintiffs are imputed with notice received by Ms. Kostukovsky. *See* Cal. Civ. Code § 2332 ("As against a principal, both principal and agent are deemed to have notice of whatever either has notice of, and ought, in good faith and the exercise of ordinary care and diligence, to communicate to the other.").

P. Indeed, it was exactly this logic that led to Ms. Oirbans' realization. Ex. 593. The problem for Plaintiffs is that Ms. Oirbans' realization rested upon marketing material produced by Plaintiffs in 2008 and in Plaintiffs' possession. Ex. 593 at 2–3. It would be inequitable for Plaintiffs to use Defendant's SaaS model as a marketing tool to develop business only to later claim ignorance of Defendant's use of SaaS as a basis to cry foul in this litigation.

Q. **Third,** the negotiations for the 2018 Amendment provide additional evidence of Plaintiffs' knowledge. During these negotiations, Defendant explained their billing practices, and Plaintiffs relied on Defendant's practices to bargain for an increase to the percentage rates. In return, Defendant obtained a commitment that they could continue their billing practices.

R. In sum, under either a preponderance or clear and convincing standard, Defendant has satisfied this first element.

## II. Estoppel Element Two: Intent

S. Defendant must show that Plaintiffs intended their conduct "shall be acted upon," or that Plaintiffs acted such that Defendant has a right to believe Plaintiffs' conduct was so intended. *City of Goleta*, 40 Cal. 4th at 279. Under the latter option, "the question is whether the record supports a finding that it was reasonable for the [party asserting estoppel] to believe the [party to be estopped] intended others to take action based on its [conduct]." *Feduniak*, 148 Cal. App. 4th at 1367.

T. Defendant entered into two bargained-for contract amendments with Plaintiffs, one in 2014 and one in 2018. Ex. 539; Ex. 17. Prior to both amendments, Defendant had only paid based on an annual fee, quarterly fee, and basic fee regime, and Plaintiffs had never rejected a royalty report. *See* Exs. 32–51, 509–512, 514, 519, 552, 563, 605, 616, 623, 627 644–648, 651. It was reasonable for Defendant to believe that Plaintiffs intended Defendant to take action—

enter into the contract amendments—based on this course of conduct. Indeed, in the 2018 negotiations, Defendant bargained for a continuation of the payment regime in exchange for paying a higher royalty percentage to Plaintiffs, and it was reasonable for Defendant to believe that Plaintiffs intended it sign that amendment based on the agreement that Defendant could continue paying as it had been paying.

U. In sum, under either a preponderance or clear and convincing standard, Defendant has satisfied this element.

**III. Estoppel Element Three: Ignorance**

V. Defendant must show that it was "ignorant of the true state of the facts." *City of Goleta*, 40 Cal. 4th at 279. Indeed, "the person seeking estoppel must show diligence on his own part." *Drinnon v. Oliver*, 24 Cal. App. 3d 571, 582 (1972).

W. Defendant reported its fees under an annual fee, quarterly fee, and basic fee regime for the entire relationship. *See* Exs. 32–51, 509–512, 514, 519, 552, 563, 605, 616, 623, 627 644–648, 651. Whenever Plaintiffs attempted to push Defendant into its strict construction, Defendant consistently clarified its position. Ex. 17 at 6 (Mr. Trachtenbarg describing annual/quarterly fees as "what you call maintenance"); Ex. 557 at 4–19 (complying with Plaintiffs' new template but naming all fees as annual, quarterly service, or basic fees). Defendant forthrightly told Plaintiffs how it calculated payments, and Plaintiffs not only did not disabuse them of their method but agreed that Defendant may continue paying as it had been. Ex. 17. Indeed, Defendant's interest in continuing the same payment model became a bargaining chip for Plaintiffs to negotiate higher percentage fees from Defendant. Ex. 17.

X. However, Mr. Trachtenbarg was not ignorant to the industry's definition of maintenance—updates, upgrades, customer support, and similar. Trachtenbarg Tr. at 56:20–24;

*see also id.* at 63:24–64:08. Nor was he ignorant that the agreement with Plaintiffs, since 2014, used the term "annual maintenance." Ex. 52 at 6. Nor was he ignorant that the agreement with Plaintiffs controls their relationship. Tr. (Day 3) 573:4–24.

Y. The Court considers this ignorance element to be the closest question. The Court concludes that the body of evidence favors Defendant because Defendant is the only party that explicitly shared its interpretation of the proper billing method. Plaintiffs, on the other hand, never shared their interpretation of the contract with respect to how annual, quarterly service, and basic fees should be handled. Defendant was thus ignorant of the specific fact that its handling of fees under the annual/quarterly service/basic regime was improper and this ignorance was fostered by Plaintiffs' continued allowance, and even encouragement, that Defendant continue to pay as it had

Z. That said, the Court cannot reach a conclusion of clear and convincing evidence on this prong because of Mr. Trachtenbarg's lack of ignorance of the industry's definition of maintenance and the implications of that definition for Defendant's fee regime.

AA. In sum, Defendant satisfies this third element under a preponderance standard but not a clear and convincing standard.

**IV. Estoppel Element Four: Reliance**

BB. Defendant must show that it relied upon Plaintiffs' conduct to its injury. *City of Goleta*, 40 Cal. 4th 279. Defendant's reliance "must have been reasonable under the circumstances." *Adoption of S.S.*, 72 Cal. App. 5th 607, 631 (2021) (quoting *Mills v. Forestex Co.*, 108 Cal. App. 4th 625, 655 (2003)).

CC. Defendant reasonably relied on Plaintiffs' uninterrupted acceptance of its quarterly royalty reports through the 2014 Amendment to continue performing in the same

manner. Plaintiffs did not raise any payment calculation issues in the 2014 Amendment negotiations. Ex. 539. After the 2014 Amendment went into effect, Defendant continued sending its royalty reports in the exact same format and Plaintiffs continued to accept them. *Compare* Ex. 32 (royalty report for Q4 2013 listing payments for annual fees and service fees subject to lower percentage on pages 1–7 and basic fees subject to higher percentage on page 7), *with* Ex. 33 (royalty report for Q3 2014 listing same). Defendant reasonably entered the 2014 Amendment with the assumption that it could continue paying in the same manner; this reliance caused Defendant's injury in the instant litigation.

DD. Defendant further reasonably relied on Plaintiffs' statement in the 2018 negotiations that Defendant could continue paying royalties as it had historically. Ex. 21 at 1.

EE. In sum, under either a preponderance or clear and convincing standard, Defendant has satisfied this fourth element.

***

As discussed above, California law is unclear as to the applicable burden of proof for the equitable estoppel defense. The Court applies the preponderance standard. While Defendant has established three of the four elements under the higher clear and convincing standard, the Court finds Defendant established the third element only by a preponderance of the evidence. Under the Court's application of California law, this is sufficient to estop Plaintiffs from recovering under the contract.

**MOTION TO STRIKE**

Defendant moves to strike paragraphs 8, 12, 19, 34, and 45 from Plaintiffs' FF&CL for raising a fraud theory that Defendant argues Plaintiffs failed to raise in the pretrial order. Def.'s Mot. Strike 1. Plaintiffs argue that they raised allegations of misrepresentation at summary

judgment and that this is simply a characterization of the parties' conduct during the 2018 negotiations. Pls.' Opp'n Def.'s Mot. 5, ECF No. 209. Because Plaintiffs' characterization of Mr. Trachtenbarg's comments did not change the Court's evaluation of the record, the Court denies Defendant's motion as moot. Whether Plaintiffs had described Mr. Trachtenbarg's statements as "knowing concealment or intentional misrepresentation" or had simply described them as "misleading" as the parties did in summary judgment proceedings, the Court would have examined the record and reached the same conclusion: Defendant can show ignorance by a preponderance but not clear and convincing. Thus, the Court denies Defendant's motion.

**CONCLUSION**

The Court finds that Defendant has established the affirmative defense of equitable estoppel by a preponderance, but not by clear and convincing, evidence. The parties are directed to confer and file a proposed judgment within fourteen (14) days of these Findings of Fact and Conclusions of Law.

Defendant's Motion to Strike [208] is DENIED as moot.

IT IS SO ORDERED.

DATED this 11th day of September, 2026.

AMY M. BAGGIO
United States District Judge